**Opinion filed April 14, 2011**



In The

# Eleventh Court of Appeals

_____

## No. 11-09-00328-CV
_____

## LARRY T. LONG, Appellant

## V.

## RIM OPERATING, INC., Appellee

**On Appeal from the 106th District Court**

**Dawson County, Texas**

**Trial Court Cause No. 08-06-17940**

## O P I N I O N

This is a dispute over the ownership of a working interest in a 160-acre tract of land in Dawson County. RIM Operating, Inc. filed suit against Larry T. Long seeking a declaratory judgment that Long relinquished his interest to other working interest owners when he did not consent to a workover operation. The trial court granted summary judgment for RIM and awarded it attorney's fees. We reverse the attorney's fee award and remand for a factual determination but otherwise affirm the trial court's judgment.

### I. *Background Facts*

The 160-acre tract for which this dispute concerns was leased with ten leases (Lindsey Leases). The properties covered by the Lindsey Leases are not uniform, but all include the eastern portion of Section 109.[1] In January 1995, the working interest owners executed an

---

[1]Specifically, Section 109, Block M, E.L. & R.R. Ry. Co. Survey, Dawson County, Texas.

A.A.P.L. Form 610-1982 Model Form Operating Agreement (JOA) that covered all of Section 109. In 1997, the Lindsey Trust 109-A No. 1 Well (Lindsey Well) was drilled in the southeastern corner of Section 109. The Lindsey Leases provide that a well maintains the lease only as to the proration unit designated by the Railroad Commission. In 1998, the operator filed an affidavit in the real property records of Dawson County designating a 160-acre proration unit surrounding the Lindsey Well.[2] A survey showing the unit and well location was attached to the affidavit.

Forcenergy was a working interest owner in the Lindsey Well. It assigned its interest in the Lindsey Well and one other well, along with the underlying leases, to Long on December 1, 2000. Long concedes that his interest is subject to the 1995 JOA.[3] RIM became operator of the Lindsey Well in October 2004.

The Lindsey Well was the only producing well on the 160-acre tract. On December 19, 2006, the Lindsey Well ceased to produce because of parted rods. On January 10, 2007, RIM submitted an AFE (Authorization for Expenditure) to all working interest owners proposing a workover, or repair, operation. The total estimated cost was $320,686. Long's share was $124,540. Long did not respond. RIM attempted to repair the Lindsey Well, and it determined that there was a partial casing collapse. In July 2007, RIM drilled a replacement well and reestablished production.

The JOA provides that, if a working interest owner goes nonconsent on a proposed operation, it relinquishes its right to any production from that well until its share of the costs, plus an additional 200% or 500% depending upon the type of cost incurred, has been recouped by the consenting parties. However, for operations denominated as "Required Well or Operations," JOA Article XV.K. provides:

> Notwithstanding anything to the contrary herein contained, it is understood and agreed that the non-consent provisions of Article VI.B.2. shall not be applicable to any well or operation which is necessary to perpetuate an expiring lease or leases* or to earn an interest in a lease or leases pursuant to any

---

[2]This tract was described as:

The south 188.182 acres of the East 3/8ths of said Section 109, SAVE AND EXCEPT the 26.667 acre tract included in the pooled unit surrounding the Patrick – Lindsey Trust 109 No. 1 Well as described in Pooling Agreement and Declaration of Pooled Unit dated January 1, 1995, filed at Volume 371, Page 385 of the Oil and Gas Lease Records of Dawson County, Texas; and, LESS the South 100 feet of said 188.182 acre tract.

[3]During a hearing on RIM's motion for summary judgment, Long acknowledged that he was subject to the JOA's nonconsent penalty.

farmout or other agreement. To "earn an interest" as abovementioned is herein understood to include completion operations if production is required to earn, whether or not drilling has extended the lease or continued the right to drill. Any well drilling or other operation which is necessary to perpetuate or earn a lease or interest therein shall be deemed to be a "required well" or "required operation." As to any required well or required operation proposed by any party hereto in which any other party hereto elects not to participate, the non-participating party shall release and relinquish forever proportionately to the participating parties all of non-participating party's interest in and to the lease or leases or interest ("relinquished leases") herein which would be perpetuated by such required well or required operation. The interest in such relinquished leases shall be assigned by the non-participating party to the participating parties without warranty of title except as to claims by, through or under assignor and shall be free of any additional burdens as is provided for in Article III.D hereof. All other leases or interests in which the non-participating party owns an interest which are pooled with the relinquished leases to form a proration unit under the regulations of the governmental authority having jurisdiction shall be subject to Article XV.L. herein. Nothing herein shall be construed to require the reduction of such non-participating party's interest in any producing wells or units.

*As used in this section, an expiring lease(s) is defined to be any oil and gas lease which would expire within 60 days of the commencement of the proposed operation but will not then expire if such operation is commenced.

In January 2008, RIM forwarded Long an assignment of his interest in the 160-acre tract to the consenting parties. Long did not respond. RIM then filed this declaratory judgment action.

## II. *Issues*

Long challenges the trial court's judgment with eleven issues. Long argues first that the trial court erred because the JOA violates the statute of frauds. Long argues in Issues Two and Five that there are unresolved fact questions. In Issue Three, he contends that conditions precedent were unsatisfied. He argues in Issue Four that there was no evidence of the actual commencement date of the rework operation. In Issue Six, Long argues that the JOA contains an unenforceable penalty. In Issue Seven, he contends that the JOA's forfeiture provision is unenforceable. In Issue Eight, he argues that the JOA violates the Rule Against Perpetuities. He contends in Issue Nine that the trial court lacked subject-matter jurisdiction because RIM did not have standing. In Issue Ten, he argues that the trial court erred by denying his plea in abatement. Finally, in Issue Eleven, he contends that the trial court erred by granting attorney's fees because there were unresolved questions of fact.

3

### III. *Special Exception*

Long's brief begins with a discussion of his special exception to RIM's motion for summary judgment. We assume that this was intended as an introduction to his other issues because he raises no specific issue complaining of the trial court's ruling. Even if we are incorrect, Long has identified no error with respect to his special exception.

### IV. *Jurisdiction*

Long complains that the trial court lacked jurisdiction because RIM lacked standing. Specifically, Long complains that RIM is improperly using a suit for declaratory judgment to affirmatively alter the rights, status, and legal relationships of the parties to the JOA by forcing him to assign his interests and that RIM suffered no legal injury because it owns no interest in the well and, therefore, is not entitled to an assignment of his interest.

Standing is a prerequisite to subject-matter jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553, 558 (Tex. 2000). A party has standing if: (1) it has sustained, or is immediately in danger of sustaining, some direct injury as a result of the defendant's wrongful act; (2) it has a direct relationship between the alleged injury and the claim being adjudicated; (3) it has a personal stake in the controversy; (4) the challenged action has caused it some injury in fact, either economic, recreational, environmental, or otherwise; or (5) it is an appropriate party to assert the public's interest in the matter, as well as its own. *Walton v. City of Midland*, 287 S.W.3d 97, 100 (Tex. App.—Eastland 2009, pet. denied).

Whether a court has subject-matter jurisdiction is a question of law and, therefore, is reviewed de novo. *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). Initially, we determine jurisdiction by considering whether a plaintiff has alleged facts that affirmatively demonstrate a trial court's subject-matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). The pleadings are construed liberally in favor of the plaintiff, and we look to the pleader's intent. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). In some instances, however, consideration of evidence and resolution of disputed facts are necessary to determine jurisdiction. *Miranda*, 133 S.W.3d at 226. In that instance, we consider any relevant evidence submitted by the parties when necessary to resolve the jurisdictional issue raised. *Id.* at 227.

The trial court had subject-matter jurisdiction. District courts have a broad grant of jurisdiction to resolve disputes. Consequently, a constitutional presumption exists that they are authorized to resolve a dispute. *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004). TEX.

4

CIV. PRAC. & REM. CODE ANN. § 37.004(a) (Vernon 2008) specifically vests trial courts with the jurisdiction to hear requests for declaratory relief from persons interested under a written contract, to determine any question of construction or validity arising under that contract, and to issue a declaration of rights, status, or other legal relations under that contract.

RIM was an interested party. RIM's live pleading, its third amended petition, alleged that it was the operator of the land in dispute, that Long's interest was subject to the terms of a JOA, that this JOA covered the Lindsey 109-A No. 1 well, that Long failed to respond to an AFE seeking approval of a repair to the well, and that, therefore, he was deemed to have relinquished his interest to the participating parties. RIM also provided the court with a copy of the P-4 naming it operator of the Lindsey Trust "109" A Lease and an affidavit from its senior landman offering testimony that Goodrich Petroleum Company of Louisiana transferred operation of the Lindsey Well to RIM effective October 1, 2004.

RIM did not seek inappropriate relief. RIM sought a declaratory judgment that (1) Long was bound by the terms of the JOA, (2) Long refused to consent to operations necessary to perpetuate the leasehold, (3) Long has forfeited his interest in the leasehold, (4) Long's interest is now owned by the consenting working interest owners, and (5) Long's forfeiture was effective no later than thirty days after February 5, 2007. Contrary to Long's argument, these were not requests to affirmatively alter the rights, status, and legal relationships of the parties to the JOA by forcing him to assign his interests. First, RIM merely sought clarification of the parties' current ownership interests. Second, RIM did not request specific performance.

Finally, it was unnecessary for RIM to own an interest in the well to have standing. As the operator, it is responsible to the working interest owners and, therefore, has an interest in determining who they are. Because the working interest owners' rights and liabilities depend, in part, on their percentage of ownership, RIM also has an interest in determining those percentages. RIM established that a justiciable controversy existed because of Long's alleged failure to respond to the AFE and the possibility that this failure resulted in a forfeiture of his interest in favor of the consenting working interest owners. The trial court, therefore, did not err by denying his plea to the jurisdiction. Issue Nine is overruled.

Long also argues that the trial court lacked jurisdiction because it could not issue a declaratory judgment as to parties who were not before it. There is no dispute that the parties to whom RIM alleges Long is contractually obligated to assign his interest in the Lindsey Well are not parties. TEX. CIV. PRAC. & REM. CODE ANN. § 37.006(a) (Vernon 2008) provides that,

5

"[w]hen declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties. A declaration does not prejudice the rights of a person not a party to the proceeding." Because this suit could result in a declaration that the consenting working interest owners are entitled to a portion of Long's interest, they are undoubtedly permissive parties. But their absence did not deprive the trial court of jurisdiction. This court has held that all royalty owners are not required to be joined in a declaratory judgment action seeking a declaration that a lease had terminated and that a unit was void. *Sabre Oil & Gas Corp. v. Gibson*, 72 S.W.3d 812, 816 (Tex. App.—Eastland 2002, pet. denied). We noted in that case that, even though the missing royalty owners had an interest in the litigation because their share of the production from the pooled unit would be affected, their presence was unnecessary to determine whether Sabre pooled in bad faith and breached the terms of the lease. *Id.*

The same situation is present here. The other working interest owners have an interest in this litigation, but their presence was unnecessary for the trial court to determine whether JOA Article XV.K. required Long to assign his interest to them. Issue Ten is overruled.

V. *Statute of Frauds*

Long contends that JOA Article XV.K. violates the statute of frauds, TEX. BUS. & COM. CODE ANN. § 26.01 (Vernon 2009). Specifically, Long complains that there is no designation or description of the assignor or assignees, that there is an insufficient description of the interests in the leases to be released and assigned, and that there is no reference to an extrinsic writing sufficient to supply the missing information. As we understand Long's position, Article XV.K. violates the statute of frauds because the day it was executed the parties conditionally agreed to convey real property interests in the future but did so without knowing what interests they could be required to assign or to whom those assignments would be made. RIM responds that we must look beyond Article XV.K. and consider the four corners of the JOA; that we must also consider any documents referenced in the JOA or otherwise in Long's chain of title; and that, when we do so, all the information necessary to satisfy the statute of frauds will be found.

The statute of frauds requires that the property to be conveyed be adequately described by providing the means or data by which it may be identified with reasonable certainty. *Kmiec v. Reagan*, 556 S.W.2d 567 (Tex. 1977). The description cannot be arrived at from tenuous inferences and presumptions of doubtful validity. *Rowson v. Rowson*, 275 S.W.2d 468 (Tex. 1955). The description must be either in the writing itself or in another existing document

6

specifically referenced in the writing. *Wilson v. Fisher*, 188 S.W.2d 150 (Tex. 1945). The certainty of the contract may be aided by parol evidence in limited situations. Essential elements may never be supplied. The details that merely explain or clarify the essential terms appearing in the instrument may ordinarily be shown by parol evidence. But the parol evidence must not constitute the framework or skeleton of the agreement. That framework must be contained in the writing. Thus, the resort to extrinsic evidence is not for the purpose of supplying the location or description of the land, but only for the purpose of identifying it with reasonable certainty from the data in the memorandum. *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 877 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Long initially argues that there is no proper description of the assignor or assignee within JOA Article XV.K. We disagree with both Long's inference and his conclusion. First, we disagree with his inference that our analysis is limited to the language of JOA Article XV.K. We can, instead, consider the entire agreement and any other documents referenced in that agreement. Second, we disagree that the JOA fails to adequately identify the assignors and assignees. The JOA itself is limited to the parties to that agreement. From this group, assignors will be those who do not participate in a required well or operation. The assignees will be those who do.

Long next argues that Article XV.K. contains an insufficient description of the leases to be released and assigned. Again, we disagree. The first page of the JOA defines the contract area as:

> See Exhibit "A" Attached Hereto[.] All of Section 109, the N/2 of Section 108 and the W/4 of Section 94, Block M, EL&RR Ry. Company Survey COUNTY OR PARISH OF Dawson STATE OF Texas.

Exhibit "A" to the JOA further defines the lands subject to the agreement as:

> Tract No. 1:   The East 3/8th acres of Section 109
> Tract No. 2:   The West 5/8th acres of Section 109
> . . . .
>
> [A]ll in Block M, EL&RR Ry. Co. Survey, Dawson County, Texas from the surface of the earth to all depths.

Exhibit "A" continues with descriptions of each of the leases covering each tract. The JOA, therefore, adequately described the lands to which it was subject.

7

Long is correct that, at the time the JOA was signed, the parties did not know which leases would be expiring if Article XV.K. was invoked or even if the expiring leases were described in Exhibit "A" or would be subsequently acquired leases. This, however, is not fatal. In *Westland Oil Development Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903 (Tex. 1982), the court considered whether an AMI (Area of Mutual Interest) provision in a letter agreement was enforceable. One of the challenges to the provision was the contention that it violated the statute of frauds. The AMI provision read:

> 5. If any of the parties hereto, their representatives or *assigns*, acquire any additional leasehold interests affecting any of the lands covered by said farmout agreement, . . . such shall be subject to the terms and provisions of this agreement.

637 S.W.2d at 905. This AMI provision suffers from the same problem raised by Long. There was a reference to a contractual area, and there was a conditional agreement to assign interests in the future within this contractual area. But, the AMI did not specifically identify what interest would be assigned because no one knew whether any additional interest would be acquired, let alone what those interests might be. Despite this, the court held that the provision did not violate the statute of frauds because the farmout agreement contained a sufficient description of the three sections it covered. *Id.* at 909.[4]

A comparable situation exists here. The original parties did not know if Article XV.K. would be invoked and, if so, exactly what interest would be assigned or who would be required to assign. They did, however, know that Article XV.K. was limited to the JOA's contract area. Because that area is sufficiently described, the agreement does not violate the statute of frauds. Issue One is overruled.

## VI. *Conditions Precedent*

Long argues that two conditions precedent to the application of Article XV.K. were not met. First, Long argues that the consent of all consenting parties was not obtained. Long relies upon JOA Article VII.D.2. to contend that a well may not be reworked without first obtaining

---

[4]Long argues that a similar situation existed in *Long Trusts v. Griffin*, 222 S.W.3d 412 (Tex. 2006), and that the supreme court held that an agreement to assign undefined interest within a larger defined area was unenforceable. The court, however, held that the agreement was unenforceable because the larger area was insufficiently defined. In that case, the contract area was defined as being located "in the Northeast portion of Rusk County, Texas, and consist[ed] of 50+ leases covering approximately 2100+ net mineral acres in the Dirgin and Oak Hill Fields area" as "described in the attached Exhibit 'A.'" Exhibit A identified the lessor's name, the survey name, the term, and net acreage for each lease. The court held that this was insufficient to identify the exact location of the lease with reasonable certainty. *Id.* at 416. But as we have previously noted, the contract area description in the JOA was legally sufficient.

this consent.[5]  Long is correct that the JOA requires prior consent before engaging in any reworking operations.  Article XV.K., however, makes this provision inapplicable for required operations.  The article begins "[n]otwithstanding anything to the contrary," and then it specifically excludes the consent provisions of Article VI.B.2.  Because Article VI.B.2. creates the consenting parties, by excluding it, Article XV.K. necessarily excludes Article VII.D.2. as well.

Long next argues that there was no evidence that the operation was proposed by a party to the JOA because there is no evidence that RIM is a party to the JOA.  Long contends that there was disputed evidence whether RIM was the operator, but he points to no conflicting evidence.  RIM offered the affidavit of a senior landman, Debby Harrington.  She testified that Goodrich Petroleum transferred operation of the Lindsey Well to RIM on October 1, 2004.  She identified the JOA and a letter and AFE sent by RIM to Long proposing the repair operation on the Lindsey Well.  RIM also produced a copy of the P-4 that named RIM operator of the Lindsey Well as of October 1, 2004.  Finally, RIM offered the affidavit of its controller, Thomas M. Murphy.  He authenticated over 150 pages of joint interest billings for the Lindsey Well sent by RIM to Long and payment records evidencing payments to Long for his share of the Lindsey Well's production.  In the absence of any conflicting evidence, RIM offered sufficient evidence to establish that it was the operator of the Lindsey Well and was a party to the JOA.  Issue Two is overruled.

Long correctly notes that the record does not establish that RIM was properly selected as successor operator pursuant to Article V. of the JOA and that no evidence was produced that RIM owned any interest in any of the leases covered by the JOA.  Neither, however, is of any moment.  Long may have had grounds to challenge RIM's selection as successor operator, but there is no evidence that he ever complained of RIM's selection.  Instead, the evidence establishes that, prior to the disputed operation, he paid RIM's bills and accepted his share of production.  Long has, therefore, waived the right to complain of RIM's status as operator.  *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 750-52 (Tex. App.—El Paso 2000, no pet.).  Issue Three is overruled.

---

[5]This provision provides:

2. <u>Rework or Plug Back</u>:  Without the consent of all consenting parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

## VII. *Penalty*

Long contends that Article XV.K. creates an unenforceable penalty or forfeiture. The supreme court considered the enforceability of nonconsent penalties in *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex. 2005). In that case, the operator proposed drilling eight wells. Dorsett did not consent to any of them. 164 S.W.3d at 660. The parties' JOA imposed a 300% nonconsent penalty. *Id.* Dorsett contended that this penalty was an unenforceable liquidated damages provision. *Id.* at 664. The supreme court disagreed, finding that the clause rewarded consenting parties for undertaking a defined risk. The court also noted that liquidated damages are recoverable only where there has been a failure to perform a contractual obligation; a nonconsent election, however, is a contractual right. Consequently, nonconsent penalties are not liquidated damages. *Id.* at 664-65. Instead, they are an incentive for the risk takers by allowing reasonable compensation for agreeing to participate in new wells.

A similar situation is present here. The JOA contains standard nonconsent language for most operations. The parties, however, elected to include a customized provision for a specific class of operations. Required wells or required operations were defined as those necessary to perpetuate or earn a lease or interest therein. RIM produced evidence that the Lindsey Well was the only producing well on its proration unit and that, therefore, if the proposed rework operation was not performed, the leases would expire as to that proration unit. Long had a choice: agree to participate in operations to keep the leases in force or not. He chose not to participate. If the other working interest owners had made the same decision, the leases would have terminated, and Long would be in the same position he is in now. But, they did not. They agreed to accept the financial risk of keeping the leases intact by undertaking a workover. The extent of this risk is highlighted by the fact that RIM knew the rods had parted and suspected a casing leak. Under the best case scenario, the cost to repair the well was $320,686, but RIM warned the working interest owners that it might be necessary to sidetrack and redrill the well. We know today that not only was this additional expense incurred but, in fact, the consenting working interest owners ultimately paid to drill a replacement well. Because the consenting owners agreed to this risk and because Long is in no different position than he would be if the Lindsey Leases had not been maintained, Article XV.K. is not an unenforceable penalty or forfeiture. Issues Six and Seven are overruled.

## VIII. *Rule Against Perpetuities*

Long also argues that Article XV.K. creates a future executory interest in real property in violation of the rule against perpetuities. Texas courts have held that the rule against perpetuities is only a means of preventing unreasonable restraints on alienation and, therefore, does not bar enforcement of contractual rights to sell property that does not constitute an unreasonable restraint on alienation. *See, e.g., Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 526 (Tex. 1982) (preferential purchase right did not violate the rule against perpetuities).[6] Article XV.K. is not an unreasonable restraint on alienation because it does not prevent a working interest owner from selling its interest, restrict their ability to do so at a time of their choice, constrain to whom they may sell, or limit the price to which they may agree. Issue Eight is overruled.

## IX. *Other Issues*

Long's list of issues includes Issues Four and Five complaining of unresolved fact questions and Issue Eleven complaining of the award of attorney's fees. Long did not brief any of these issues in the argument section of his brief, and RIM argues that they have been waived. *See Trenholm v. Ratcliff*, 646 S.W.2d 927, 934 (Tex. 1983) (listing of points without argument and authorities constituted waiver). Long responds in his reply brief that these issues are briefed, contends that there is no authority limiting where an issue may be argued, and points us to his factual summary for his arguments. However, TEX. R. APP. P. 38.1(g) provides that the statement of facts "must state concisely and without argument the facts pertinent to the issues or points presented." Rule 38.1(i) defines the argument section of the brief as containing "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Consequently, RIM is correct. Issues Four, Five, and Eleven have not been preserved. In the interest of justice, however, we will consider them.

In Issue Four, Long complains that there was no evidence that any relinquishment duty owed by Long under Article XV.K. arose because there was no evidence of the actual commencement date of the rework operation. Because the operation was proposed under Article XV.K. rather than Article VI.B.1. or Article VI.B.2., it was unnecessary to prove the actual date the rework operation commenced.

---

[6]The supreme court adopted the reasoning of the lower court on this point. That opinion is at *Forderhause v. Cherokee Water Co.*, 623 S.W.2d 435, 438-39 (Tex. Civ. App.—Texarkana 1981).

11

Long argues that there was no evidence that the proposed operations were legitimate operations that invoked Article XV.K. Jason B. Rouse, an engineer for RIM, testified that the Lindsey Well was the only producing well on the 160-acre proration unit and that it ceased to produce because of parted rods. This is sufficient to establish that the repair was a required operation as defined by Article XV.K. Long also complains that there was insufficient evidence that RIM was the operator. We have previously held otherwise. Issue Four is overruled.

Long's fifth issue complains of several unresolved fact questions. Issue 5(a) contends that there was insufficient evidence describing his interest in the oil and gas leases within the proration unit. We have previously held that the JOA satisfied the statute of frauds, and Long has conceded that the JOA applied to his interest. Moreover, Long acquired his interest from Forcenergy Onshore Inc. The assignments into Forcenergy all referenced the JOA. He was, therefore, bound not only by that agreement but also by all the property descriptions contained within it.[7] We note also that the assignment from Forcenergy to Long specifically referred to the "W6613 – Lindsey Trst 109 A1" Well. Prior to his assignment, the operator filed an affidavit in the real property records designating a proration unit for a 160-acre tract surrounding the Lindsey Trust "A" No. 1 Well. The affidavit provided a legally sufficient description of the proration unit. Collectively, this is sufficient to describe the interests Long must assign because of his decision to go nonconsent on the workover. Issue 5(a) is overruled.

In Issue 5(b) Long contends that there was a fact question on whether the Lindsey Well is subject to the JOA. Long conceded in open court that his interest was subject to the JOA, and the assignments into Forcenergy, his predecessor in title, refer to the JOA. Issue 5(b) is overruled.

Long argues in Issue 5(c) that there was insufficient evidence that RIM was a party to the JOA. We have previously found that RIM was the operator. Issue 5(c) is overruled.

Long argues in Issue 5(d) that there was insufficient evidence that he breached Article XV.K. RIM offered uncontroverted evidence that by correspondence dated January 10, 2007, it sent the working interest owners an AFE to find and repair a suspected casing leak. It produced a certified mail receipt evidencing that Long received this correspondence on January 30, 2007. It also offered affidavit testimony that Long did not respond to the AFE or the request for an assignment of his interest. We have previously found that RIM produced

---

[7]*See Westland*, 637 S.W.2d at 908 ("a purchaser is bound by *every* recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims").

sufficient evidence to establish that the proposed repair was a required operation because the leases underlying the 160-acre proration unit would otherwise expire. This additional evidence sufficiently established that Long was required to participate in that operation or to assign his interest to the working interest owners who did participate and that he refused to do so. Issue 5(d) is overruled.

Long next complains in Issue 5(e) that there was insufficient evidence that RIM gave notice of the work to be performed. RIM's January 10, 2007 correspondence informed the working interest owners that it intended to do the following:

- Perforate tubing @ 5460'. Establish circulation & clean annulus to surface.
- Chem-cut tubing above anchor catcher and @ 5465'.
- PU wash pipe, jars & overshot & jar tubing out of hole.
- RIH w/ wash pipe, jars & overshot & jar TAC out of hole (may need to swedge casing).
- Run casing inspection log & set CIBP @ 9000'.
- Freepoint casing, cut & pull from hole as close to Top of cement (8700') as possible.
- Replace bad casing & rerun w/ Bowen cementing casing patch.
- Cement casing into surface pipe.
- Drill out and test casing.
- Re-perforate producing interval & stimulate w/ acid.
- Rerun production equipment and return to production.

RIM also advised the working interest owners that this would cost an estimated $320,686, and it provided a breakdown of these costs. Finally, RIM told the working interest owners that, if it encountered additional problems, operations would be suspended and a revised plan submitted.

Long correctly notes that the plan of operation described in the correspondence did not include a sidetrack operation or drilling a replacement well, but that both were done. We note that the letter did advise the working interest owners that both were possible if the initial repair was unsuccessful. RIM was not required to provide Long with additional notice. The summary judgment evidence establishes that Long did not respond to RIM's January correspondence. There is no contention that RIM did anything other than what was originally contemplated. That effort was unsuccessful, and RIM proceeded with additional activities. Because Long did not respond to the AFE, he no longer had an interest in the Lindsey Well and was not entitled to additional notice. Issue 5(e) is overruled.

In Issues 5(f) and 11, Long complains of the award of attorney's fees, contending that there were disputed questions of fact on the reasonableness of that award. RIM's counsel filed

an affidavit dated December 17, 2008, and testified that RIM had incurred fees to date of $16,931.50. He filed a second affidavit dated August 20, 2009. In that affidavit, he testified that RIM had incurred attorney's fees of $41,380. He also offered testimony as to reasonable and necessary fees in the event of an appeal. Long contends first that the difference between the two affidavits creates a fact question. However, because they represent fees incurred as of two separate dates, they are not inconsistent and no fact question was created.

Long contends second that he raised a fact question. Long responded with the affidavit of his counsel. Counsel testified that the requested fees were, in his opinion, excessive and that even $15,000 would be excessive. RIM contends that Long's affidavit was insufficient to create a fact question because it was conclusory. Long's affidavit is short on detail but no less so than RIM's affidavit. RIM's affidavit established counsel's expertise and experience in this area of the law, his familiarity with reasonable and necessary fees, and RIM's incurrence of approximately $41,000 in fees so far. Counsel did not, however, offer any evidence describing the work performed. In light of this, Long's counsel's affidavit that $41,000 was excessive based upon his experience is sufficient to create a fact question.

Issues 5(f) and 11 are sustained. This case is remanded solely for a factual determination of the reasonable and necessary fees to be awarded.

## IX. *Conclusion*

The judgment of the trial court is affirmed in part and reversed and remanded in part. That portion of the judgment awarding attorney's fees is reversed, and this cause is remanded to the trial court for a factual determination of that issue only. The remainder of the judgment is affirmed.



RICK STRANGE
JUSTICE


April 14, 2011

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

14