**Opinion filed June 10, 2021**



**In The**

# Eleventh Court of Appeals

_____

## No. 11-19-00183-CV

_____

## APOLLO EXPLORATION, LLC; COGENT EXPLORATION, LTD., CO.; AND SELLMOCO, LLC, Appellants

## V.

## APACHE CORPORATION, Appellee

**On Appeal from the 385th District Court**

**Midland County, Texas**

**Trial Court Cause No. CV50538**

### O P I N I O N

Apollo Exploration, LLC; Cogent Exploration, Ltd., Co.; and SellmoCo, LLC (collectively Appellants) and Gunn Oil Company owned 98% of the working interest in 109 oil and gas leases covering over 120,000 acres of land in the Texas Panhandle. On March 22, 2011, Appellants and Gunn Oil sold 75% of their interests to Appellee, Apache Corporation. To consummate this transaction, Appellants and Gunn Oil each executed a separate purchase and sale agreement (PSA) with Apache. Appellants subsequently sued Apache and alleged that Apache had failed to comply

with the provisions of the PSAs; Appellants also asserted breach-of-contract and tort claims and requested declaratory relief.

As relevant to this appeal, Apache filed four motions to exclude Appellants' expert witnesses on damages and five motions for partial summary judgment. Based on the trial court's rulings on these motions, Apache eventually filed a no-evidence motion for partial summary judgment challenging Appellants' breach-of-contract and tort claims on the ground that Appellants could produce no evidence to support their claims for damages. The trial court granted Apache's motion and thereafter rendered a final judgment in which it incorporated its previous summary judgment rulings, ordered that Appellants take nothing on their claims, and awarded Apache $4,800,000 in attorneys' fees pursuant to the Texas Declaratory Judgments Act.

In four issues, Appellants assert that the trial court erred when it (1) granted, in whole or in part, Apache's six motions for summary judgment; (2) struck Appellants' three expert witnesses on damages; (3) awarded attorneys' fees to Apache; and (4) entered a final judgment based on the combination of its partial summary judgments and expert exclusion orders. We affirm in part, reverse in part, and remand this cause to the trial court for further proceedings.

## I. *Factual and Procedural Background*

Appellants and Gunn Oil acquired a combined 98% working interest in 109 oil and gas leases covering over 120,000 acres in the Texas Panhandle. The lease for the Bivins Ranch accounted for approximately 100,000 of those acres. Appellants and Gunn Oil drilled a producing oil well on the Bivins Ranch and, under the terms of the Bivins Ranch lease, divided the lease into three equal blocks: the North Block, the South Block, and the East Block.

On March 22, 2011, Appellants and Gunn Oil sold 75% of their combined 98% working interest[1] in the 109 leases to Apache for approximately $338 per acre. Appellants and Gunn Oil each executed a separate PSA with Apache. Other than the identity of the defined "Seller," the interest conveyed, and the price paid, the substance of the four PSAs were identical. In this case, the majority of Appellants' claims are based on the parties' interpretations of Sections 2.5, 4.1, and 4.2 of the PSAs.

Pursuant to Section 2.5 of each PSA, the Seller, as defined in that PSA, had the right, but not the obligation, to "back-in" for up to one-third of the interest that was conveyed to Apache in the PSA at the "Back-In Trigger," which was defined as 200% of "Project Payout." In turn, "Project Payout" was defined as the first day of the month after certain defined revenue equaled certain defined costs. Each Seller also had the option, at any time, to back-in to the project by paying Apache "the remaining balance due for the Back-In Trigger." Additionally, pursuant to Section 4.2 of each PSA, Apache was required to provide the Seller with annual written payout statements that related to the status of the Project Payout and the Back-In Trigger.

In Section 4.1 of each PSA, Apache agreed that, on or before November 1 of each calendar year, it would conduct an annual review of the Assets, as defined in the PSA, and provide the Seller with a written budgeted drilling commitment for the upcoming calendar year. Apache agreed that it would make a good faith effort to comply with the written budgeted drilling commitment in order to perpetuate the "Leases," as defined in the PSA. However, if any written budgeted drilling commitment contemplated, or would result in, the loss or release of one or more of the Leases (or parts of those Leases), Apache was then required to "concurrently

_____

[1]Apache, therefore, acquired a 73.5% working interest in the 109 leases.

offer all of [Apache's] interest in the affected Leases (or parts thereof)" to the Seller at no cost to the Seller. If the Seller accepted the offered Leases, Apache was required to "transfer and assign the affected Leases (or parts thereof) to Seller."

In 2014, Apollo and Cogent sued Apache and requested a declaration of their rights under Section 2.5 of the PSAs. However, by the time that their fourth amended petition was filed in 2016, SellmoCo had been joined as a plaintiff and Appellants not only sought declaratory relief but alleged, generally, that Apache had breached the PSAs with Appellants and had committed various torts by failing (1) to provide written payout statements on an annual basis that showed the status of the Project Payout and the Back-In Trigger, (2) to provide written budgeted drilling commitments, (3) to offer to assign its interest in the affected Leases to Appellants, and (4) to correctly pay Appellants their share of the proceeds from the sale of oil and gas production.

Apache initially filed four motions for summary judgment and requested that the trial court construe the meaning of certain terms or provisions in the PSAs and in the Bivins Ranch lease. Specifically, Apache filed traditional motions for summary judgment in which it requested that the trial court construe (1) the meaning of "Back-In Trigger" in Section 2.5 of the PSAs, (2) the meaning of "Leases" and "affected Leases" in Section 4.1 of the PSAs, and (3) whether Apache was required under Section 4.1 of the PSAs to offer Appellants the portion of Apache's working interest that was originally owned by Gunn Oil. Apache also filed a combined traditional and no-evidence motion for summary judgment in which it requested that the trial court determine that the North Block lease expired on January 1, 2016, and a combined traditional and no-evidence motion for summary judgment in which it challenged Appellants' claims for fraud; breach of express trust, breach of fiduciary duty, and misapplication of fiduciary property; negligence; gross negligence; and conversion.

4

The trial court granted summary judgment in favor of Apache on Appellants' claims for breach of express trust, breach of fiduciary duty, and misapplication of fiduciary property.[2] The trial court also granted summary judgment in Apache's favor on how to calculate the "Back-In Trigger," on the meaning of "affected Leases," and on how to account for the working interest originally owned by Gunn Oil. Finally, the trial court granted Apache's motion for summary judgment on the expiration date of the Bivins Ranch North Block lease and determined that the North Block lease expired on January 1, 2016.

Apache also sought to exclude the testimony of three expert witnesses that Appellants had designated to testify on damages. Paul Dee Patterson, Appellants' first expert witness, calculated damages by relying on the discounted cash flow methodology. Apache moved to exclude Patterson's testimony on the ground that his opinions were neither relevant nor reliable. Although the trial court granted Apache's motion to exclude Patterson's testimony, it did allow Appellants additional time to designate a new expert on damages.

Peter Huddleston, Appellants' second expert witness on damages, formulated his opinions of the fair market value of the leases based on comparable transactions. Approximately 90% of Huddleston's damage calculations were based on his opinion that the Bivins Ranch North Block lease expired on December 31, 2015, rather than January 1, 2016. Apache moved to exclude all of Huddleston's opinions; however, the trial court excluded only any testimony that Huddleston intended to offer that related to an expiration date for the North Block lease other than January 1, 2016.

Two weeks before the commencement of trial, Appellants produced an expert report from Dean Graves, Appellants' accounting expert, on the issue of damages. Apache moved to exclude Graves's "new opinions" on the ground that his opinions

---

[2]The trial court denied Apache's motion for summary judgment on Appellants' other tort claims.

had not been timely disclosed. Apache also filed a second motion to exclude Huddleston's testimony on the ground that he had not revised his damage calculations following the trial court's summary judgment rulings on the expiration date of the North Block lease and on how to account for the working interest originally owned by Gunn Oil. In separate orders, the trial court granted both motions to exclude.

On the day that trial was scheduled to begin, Apache requested that the case be removed from the trial court's jury docket and that it be allowed to file a no-evidence motion for summary judgment to challenge Appellants' remaining breach-of-contract and tort claims on the ground that Appellants could produce no evidence of damages. Appellants did not oppose Apache's request. Apache filed, with leave of court, the no-evidence motion, and Appellants filed a response. The trial court subsequently granted the no-evidence motion for summary judgment. After Appellants nonsuited their remaining claims,[3] the trial court rendered a final judgment that Appellants take nothing on their claims and ordered that Apache recover attorneys' fees of $4,800,000 under the Texas Declaratory Judgments Act. This appeal followed.

## II. *Summary Judgments*

In their first issue, Appellants challenge the trial court's rulings on six motions for summary judgment filed by Apache. Appellants first assert that the trial court erred when it granted summary judgment in favor of Apache (1) on the meaning of "affected Leases" in Section 4.1 of the PSAs; (2) on the meaning of "Back-In Trigger" in Section 2.5 of the PSAs; (3) on the expiration date of the North Block lease; (4) on how to account for the working interest originally owned by Gunn Oil; and (5) on Appellants' claims for breach of express trust, breach of fiduciary duty,

---

[3]Appellants nonsuited their claims for an accounting, for declaratory relief, and for trespass to try title.

and misapplication of fiduciary property. Appellants finally contend that the trial court erred when it granted summary judgment in favor of Apache on Appellants' claims for breach of contract, fraud, negligence, gross negligence, and conversion on the ground that Appellants had no evidence of damages—a complaint that we will address later in this opinion.

A.  *Standard of Review*

We review a trial court's order granting summary judgment de novo. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021). When we review either a traditional or a no-evidence summary judgment, we consider the evidence in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in favor of the nonmovant. *Id.*; *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). We credit evidence favorable to the nonmovant if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not. *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311–12 (Tex. 2014) (per curiam).

To prevail on a traditional motion for summary judgment, the movant must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Eagle Oil & Gas*, 619 S.W.3d at 705; *see also* TEX. R. CIV. P. 166a(c). The evidence raises a genuine issue of material fact if "reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam).

"To defeat a no-evidence motion for summary judgment, the nonmovant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements." *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019); *see also* TEX. R. CIV. P. 166a(i). Evidence is no more than a

scintilla if it is "so weak as to do no more than create a mere surmise or suspicion of a fact." *KMS Retail Rowlett, LP*, 593 S.W.3d at 181.

When a trial court does not specify upon which grounds it grants summary judgment, we will affirm if any of the theories raised are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). Generally, we consider the no-evidence grounds first. *Lightning Oil*, 520 S.W.3d at 45. However, "if the movant in a traditional motion challenges a cause of action on an independent ground, we consider that ground first because it would be unnecessary to address whether a plaintiff met his burden as to the no-evidence challenge if the cause of action is barred as a matter of law." *Womack v. Oncor Elec. Delivery Co.*, No. 11-17-00233-CV, 2019 WL 3023516, at *3 (Tex. App.—Eastland July 11, 2019, pet. denied) (mem. op.); *see also Lotito v. Knife River Corp.-S.*, 391 S.W.3d 226, 227 n.2 (Tex. App.—Waco 2012, no pet.).

B. *Contract Construction*

"[P]erhaps no principle of law is as deeply engrained in Texas jurisprudence as freedom of contract." *Energy Transfer Partners, L.P. v. Enter. Prods. Partners, L.P.*, 593 S.W.3d 732, 740 (Tex. 2020). "[A]bsent a compelling reason, courts must respect and enforce the terms of a contract that the parties have freely and voluntarily made." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230 (Tex. 2019). Therefore, when we construe a contract, our primary objective "is to give effect to the written expression of the parties' intent." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019).

To ascertain the parties' intent, we look to the language of the parties' agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). "Objective manifestations of intent control, not 'what one side or the other alleges they intended to say but did not.'" *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763–64 (Tex. 2018) (footnote omitted) (quoting *Gilbert Tex. Constr.,*

*L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)).  We "presume parties intend what the words of their contract say" and interpret the language of a contract according to its "plain, ordinary, and generally accepted meaning" unless the contract directs otherwise.  *Id.* at 764 (first quoting *Gilbert Tex. Constr.*, 327 S.W.3d at 126; then quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

Because "[c]ontext is important," we consider the entire writing in an effort to harmonize and give effect to all of the provisions of the contract so that none are rendered meaningless.  *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019).  No one phrase, sentence, or section of the agreement should be isolated from its setting and considered apart from the other contractual provisions.  *Pathfinder Oil & Gas*, 574 S.W.3d at 889.  We may also consider the objectively determinable facts and circumstances surrounding a contract's execution to aid in our interpretation of the contract's language.  *URI*, 543 S.W.3d at 757–58, 764.  But the surrounding facts and circumstances cannot be used to "augment, alter, or contradict the terms of an unambiguous contract."  *Id.* at 758.  Further, we may neither rewrite the parties' contract nor add to or subtract from the contract's language.  *Id.* at 770 (citing *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 242 (Tex. 2016)).

"We construe contracts under a de novo standard of review."  *Barrow-Shaver Res.*, 590 S.W.3d at 479.  If a contract's language "can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous, and we will construe it as a matter of law."  *Id.*  However, if there are two or more reasonable interpretations of the contract, the contract is ambiguous, and a fact issue exists as to the parties' intent.  *Id.*

C.  *"Leases" and "affected Leases"*

Section 4.1 of the PSAs provided:

> Annual Review.  On or before November 1st of each calendar year subsequent to the Closing Date, Purchaser shall conduct an annual review of the Assets and provide Seller a written budgeted drilling commitment (the "Commitment") for the upcoming calendar year, which shall balance exploration and development with lease maintenance and perpetuation.  Purchaser hereby covenants to make a good faith effort to follow the Commitment in order to perpetuate the Leases, but if any Commitment contemplates or will result in the loss or release of one or more of the Leases (or parts thereof), then Purchaser shall concurrently offer all of Purchaser's interest in the affected Leases (or parts thereof) to Seller at no cost to Seller and upon Seller's acceptance of such Leases, Purchaser shall transfer and assign the affected Leases (or parts thereof) to Seller.  Seller shall have no obligation to accept the affected Leases (or parts thereof).  The purpose and intent of, and Purchaser's agreement pursuant to, this provision is to provide Seller the option and ability to perpetuate all the Leases so offered to Purchaser through a drilling program with one drilling rig, and this provision shall be interpreted to afford Seller that option and ability.  For the avoidance of doubt, Purchaser shall have no liability to Seller in the event that any budgeted drilling commitment reflected in any Commitment is not accomplished or if the actual capital spent during any year varies or deviates from any Commitment, even if such variation or deviation results in the termination, expiration or loss of any Lease; and Seller does hereby release Purchaser from any and all such liability.

The PSAs defined "Leases" as: "the oil, gas and mineral leases described in Part 1 of Schedule 1.2(a), and such other oil, gas and mineral leases in which Seller may own an interest to the extent such other leases cover and include the lands located within the outlined area shown on Part 2 of Schedule 1.2(a)."

Apache moved for a traditional summary judgment on the construction of the terms "Leases" and "affected Leases."  Apache argued that the term "Leases" referred to the 109 individual oil and gas leases in which Apache had acquired an interest under the PSAs and that the term "affected Leases" meant the Leases that,

10

based on a written budgeted drilling commitment, would be lost or released in the next calendar year.

Appellants responded that the stated purpose of Section 4.1 was to allow Appellants to hold the entire acreage with a minimum number of wells. Appellants argued that Section 4.1 was intended to protect Appellants from losing the opportunity to hold the large, contiguous acreage due to Apache's decision to drill wells only in a proven field. Appellants asserted (1) that the term "Leases" meant all of Apache's interests as outlined on the schedules to the PSAs and included collections of individual lease agreements and (2) that the term "affected Leases" included more than just the individual leases that would be lost or released. Appellants specifically argued that several leases were for fractional interests in the minerals on the same acreage. Therefore, in order to allow Appellants to economically perpetuate the lease for one of the fractional interests, Apache was required to offer its interest in all other leases that covered the same acreage.

The trial court granted the motion for summary judgment, in part, and only "as to the meaning of the unambiguous term 'affected Leases.'"[4] The trial court determined that "affected Leases" means "those of the 109 Leases described in Schedule 1.2(a) of the PSAs whose loss or release was contemplated by or would result from one of Apache's Commitments." Appellants contend that the trial court's interpretation of Section 4.1 essentially rewrote the parties' agreement. We disagree.

The PSAs defined "Leases" as the 109 leases specifically listed in Schedule 1.2(a) and any other lease within a delineated geographical area in which Appellants owned an interest. Neither party presented any evidence that Appellants

---

[4]Apache also moved for summary judgment on Appellants' claims that Apache breached Section 4.1.

owned an interest in any lease, other than the 109 specifically listed leases, that fell within the definition of Leases. Therefore, the term "Leases" is limited to the 109 leases specifically listed in Schedule 1.2(a) of the PSAs.

In Section 4.1 of the PSAs, the parties addressed Appellants' rights in the event that Apache failed to perpetuate any of the leases. The parties agreed that, if a written budgeted drilling commitment contemplated, or resulted in, the whole or partial loss or release of one of the 109 leases in the next calendar year, Apache would then be required to offer its interest in the "affected Leases" to Appellants.[5] The word "affected" is not defined in the PSAs. However, the common meaning of the word "affect" is "to produce an effect upon." *Affect*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/affect (last visited on June 7, 2021). "Effect" means "something that inevitably follows an antecedent (such as a cause or agent)." *Effect*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/effect (last visited on June 7, 2021).

Based on the common understanding of the word "affected" as used by the parties, the term "affected Leases" in Section 4.1 of the PSAs means any of the 109 scheduled leases that, because that lease would be wholly or partially lost or released in the following calendar year, produced the effect of requiring Apache to offer its interest in that lease to Appellants. Therefore, we hold that the trial court properly granted summary judgment in favor of Apache when it determined that the term "affected Leases" means "those of the 109 Leases described in Schedule 1.2(a) of

---

[5]Appellants rely heavily on the fact that, during the parties' negotiation of the PSAs, Appellants proposed that Apache would be required to offer "such Leases" to Appellants; however, Apache changed the term to "affected Leases." Based on this change in language, Appellants argue that because "such" leases would mean the leases that would be lost or released, "affected" must mean something else. However, evidence of the parties' substantive negotiations that "directly relates to the creation of the parties' unambiguous agreement" is generally barred by the parol evidence rule. *Barrow-Shaver*, 590 S.W.3d at 483.

the PSAs whose loss or release was contemplated by or would result from one of Apache's Commitments."

D. *Gunn Oil Interest*

On March 22, 2011, Apache purchased 75% of Appellants' and Gunn Oil's working interests in the 109 oil and gas leases. Pursuant to Section 4.1 of each PSA, if a written budgeted drilling commitment contemplated, or resulted in, the loss or release of a lease, either wholly or partially, in the next calendar year, Apache would then be required "to concurrently offer all of [Apache's] interest in the affected Leases (or parts thereof) to Seller at no cost to Seller." Gunn Oil sold its remaining working interest in the 109 leases, including its rights under the 2011 PSA, to Apache in 2014.

Apache filed a traditional motion for summary judgment in which it asserted that, as a matter of law, it was not required to include the working interest originally owned by Gunn Oil when it offered leases to Appellants pursuant to Section 4.1 of the PSAs. Apache argued (1) that it was impossible to assign all of its interest in a lease to four different parties; (2) that all four PSAs had to be construed together; (3) that, pursuant to the Gunn Oil PSA, Gunn Oil would be entitled to an offer of its proportionate share of any affected Leases; and (4) that the requirement that Apache offer all of its interest in a lease would result in a forfeiture and violate the rule against perpetuities (the Rule). Apache requested that the trial court construe Section 4.1 of the PSAs to mean that Apache was required to offer each Seller only the proportionate share of the working interest that the Seller conveyed to Apache and that, as a result of this construction, the trial court also determine that Appellants' damages, if any, for the breach of Section 4.1 must exclude the interest originally owned by Gunn Oil.

Appellants responded that each PSA defined only one Purchaser and one Seller. Apache was defined as the Purchaser in each PSA and was required by each

PSA to concurrently offer all of its interest in the affected Leases (or parts thereof) to the "Seller," as defined in each PSA. Appellants asserted that "all" means "all," that Apache's contention that "all" means "less than all" is not included in any PSA and is contrary to the canons of contract construction, and that Section 4.1 did not constitute a forfeiture and did not violate the Rule.

The trial court granted Apache's motion for summary judgment and ordered that, under Section 4.1, Apache was required to "only offer each Seller the proportionate share of the working interest that such Seller conveyed to Apache in March 2011." The trial court also ordered that Appellants' "damages for breach of or failure to comply with Section 4.1 of the PSAs must be based on the working interest that each [Appellant] conveyed to Apache in March 2011, and will exclude any interest once held by Gunn Oil."[6]

The parties first dispute whether the four PSAs must be construed together. Under appropriate circumstances, "instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020) (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)). "[I]nstruments

---

[6]In support of its motion for summary judgment on the meaning of "Leases" and "affected Leases," Apache requested permission to file certain summary judgment evidence, including the Gunn Oil PSA, under seal. The trial court granted Apache's request to file the exhibits under seal, but the exhibits were never filed with the district clerk. After this appeal was submitted, and pursuant to this court's request, the parties filed the exhibits under seal.

At the hearing on Apache's motion for summary judgment on whether it was required by Section 4.1 to offer to Appellants the working interest originally owned by Gunn Oil, Appellants objected that the Gunn Oil PSA was not included in the summary judgment record. The trial court sustained Appellants' objection but granted Apache's request to supplement the record with the Gunn Oil PSA. Appellants contend that the trial court erred when it allowed Apache to subsequently file the Gunn Oil PSA without being required to show good cause for, and no undue prejudice from, the late filing. Because we hold that the trial court erred when it granted Apache's motion for summary judgment on how to account for the Gunn Oil working interest, we need not address this complaint. *See* TEX. R. APP. P. 47.1.

14

may be construed together or treated as one contract even though they are not between the same parties." *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981). "Where appropriate, 'a court may determine, as a matter of law,' that multiple separate contracts, documents, and agreements 'were part of a single, unified instrument.'" *Rieder*, 603 S.W.3d at 94 (quoting *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840). In making that determination, a court may consider whether each written agreement and instrument was a necessary part of the same transaction. *Id.* Because "tethering documents to each other is 'simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation,'" a court must use caution when construing multiple documents together. *Id.* at 95 (quoting *Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959)).

Here, regardless of whether we construe the four PSAs separately or together, the meaning is the same. Section 4.1 of each PSA required Apache to offer to the Seller, who is defined in each PSA, "all" of its interest in "any Lease (or part thereof)" if Apache's annual written budgeted drilling commitment contemplated, or resulted in, the whole or partial loss or release of the lease in the next calendar year. Therefore, even if all four PSAs are read together, the PSAs (1) still require that Apache must offer "all" of its interest to all four Sellers and (2) do not limit the interest that Apache must offer to each Seller to only the interest that Apache acquired from that Seller. This interpretation is unavoidable.

Further, when considering all of the PSAs' provisions, it is clear that the parties, in other circumstances, limited any right or duty to pertain only to the interest that was being conveyed under each PSA. For instance, in Section 2.5 of each PSA, the Seller was given the right, under certain circumstances, "to back-in for up to one-third (1/3rd) of the interests conveyed to Purchaser in and to the Assets hereunder at Closing." Although Section 2.5 in each PSA limited the Seller's back-in right to the

15

assets conveyed under that PSA, Section 4.1 does not contain a similar limitation as to the interest that Apache must offer to the Seller.

As to Apache's argument that it is impossible for it to offer all its interest in any lease to four different parties, we must avoid construing a contract in a manner that makes performance impossible. *See Temple-Eastex Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex. 1984); *Wade Oil & Gas, Inc. v. Telesis Operating Co.*, 417 S.W.3d 531, 538 (Tex. App.—El Paso 2013, no pet.). However, the fact that Apache is required to offer all its interest to multiple parties does not make performance impossible under all circumstances. *See Westwind Expl., Inc. v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 382 (Tex. 1985) (holding that the fact that construction of contract that made performance impossible based on presentment actually made by the appellant did not mean that performance would always be impossible). For example, only one Seller could accept an offered assignment. Further, even if more than one Seller accepted an offer, Apache could transfer and assign all its interest in any lease to the participating parties, collectively.

Apache also argued that, if it were required to offer all its interest in any lease to each Seller, it would forfeit the rights that it acquired from Gunn Oil in 2014. "Courts will not declare a forfeiture unless they are compelled to do so by language which can be construed in no other way." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987); *see also Fischer*, 479 S.W.3d at 239 ("Forfeitures are not favored in Texas, and contracts are construed to avoid them." (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009))). Here, Apache agreed in Section 4.1 of each PSA that, if a written budgeted drilling commitment contemplated, or resulted in, the whole or partial loss or release of any of the 109 leases in the next calendar year, it would then be required to offer all its interest in that lease, or portion of the lease, to each Appellant and to Gunn Oil. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017) (holding that, without

16

compelling reasons, a court must respect and enforce the terms of a contract freely and voluntarily agreed to by the parties and that as a rule, if the agreement does not violate the law or public policy, the parties have the right to contract as they see fit). Furthermore, Apache's post-contract acquisition of Gunn Oil's rights under the 2011 PSA affects neither the interpretation of Section 4.1 nor Appellants' rights under the PSAs. *See Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 206 (Tex. 2019) ("Where contracts are unambiguous, we decline to consider the parties' course of performance to determine its meaning."); *Fairfield Indus., Inc. v. EP Energy E&P Co., L.P.*, 531 S.W.3d 234, 248 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (holding that the appellee's unilateral actions after contract formation did not operate to discharge the appellee's obligations under the contract). As such, no forfeiture would occur as Apache suggests.

Apache finally asserted that a requirement that it offer the working interest originally owned by Gunn Oil to Appellants would violate the Rule. Apache specifically argued that, because Apache could hold any of the leases indefinitely, Appellants' right to acquire the working interest originally owned by Gunn Oil could vest outside the time period required by the Rule. We disagree.

A perpetuity is a restriction on the power of alienation that lasts longer than the prescribed period. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 866–67 (Tex. 2018). As to real property, the Rule provides that "no interest is valid unless it must vest, if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance." *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 479 (Tex. 2017) (quoting *Peveto v. Starkey*, 645 S.W.2d 770, 772 (Tex. 1982)). "In applying the Rule, we look at the conveyance instrument as of the date it is executed, 'and it is void if by any possible contingency the grant or devise could violate the Rule.'" *Id.* at 479–80 (quoting *Peveto*, 645 S.W.2d at 772). "If an instrument is open to two constructions, we do not declare the interest void because

17

it can be assumed safely that the grantor intended to make a legal conveyance." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 343 (Tex. 2020). "The Rule does not apply to present property interests or to future interests that vest at the time of their creation." *Id.*

Because the "rights of the parties are governed by the language used," *Peveto*, 645 S.W.2d at 772, we must examine the nature of the interest conveyed in Section 4.1 to determine whether the Rule applies, *see Laddex*, 513 S.W.3d at 480. Apache's interest in any lease did not automatically vest in Appellants at any time. Rather, Section 4.1 required Apache to offer to Appellants all of Apache's interest in any of the 109 leases listed in the PSAs that Apache's annual written budgeted drilling commitment either contemplated, or resulted in, being wholly or partially lost or released in the next calendar year. Appellants could choose to accept or to refuse Apache's interest in any offered lease. Therefore, Appellants' rights under Section 4.1 are very similar to a right of first refusal.

"A right of first refusal, also known as a preemptive or preferential right, empowers its holder with a preferential right to purchase the subject property on the same terms offered by or to a bona fide purchaser." *Archer v. Tregellas*, 566 S.W.3d 281, 286–87 (Tex. 2018) (quoting *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 644 (Tex. 1996)).

> A preferential right to purchase differs from a standard option in that the latter gives the optionee the right to compel a sale of the property at a stipulated price, whereas the holder of a preferential purchase right has no right to compel a sale or to prevent a sale, but only has the right to be offered the property at a fixed price or a price offered by a bona fide purchaser if and when the owner decides to sell.

*Forderhause v. Cherokee Water Co.*, 623 S.W.2d 435, 438 (Tex. App.—Texarkana 1981), *rev'd on other grounds*, 641 S.W.2d 522 (Tex. 1982); *see also Archer*, 566 S.W.3d at 287. A preferential right to purchase does not violate the Rule because

18

the Rule "is only a means of preventing unreasonable restraints on alienation, and if a preferential right to purchase does not operate to restrain alienation, but only dictates who shall have the first right to acquire property when and if the owner decides to sell it, then the agreement is not within the prohibition." *Forderhause*, 623 S.W.2d at 438;[7] *see also Jarvis v. Peltier*, 400 S.W.3d 644, 652 (Tex. App.—Tyler 2013, pet. denied) ("In Texas, a preferential right to purchase or a right of first refusal does not violate the rule against perpetuities."); *Long v. RIM Operating, Inc.*, 345 S.W.3d 79, 91 (Tex. App.—Eastland 2011, pet. denied) ("Texas courts have held that the rule against perpetuities is only a means of preventing unreasonable restraints on alienation and, therefore, does not bar enforcement of contractual rights to sell property that [do] not constitute an unreasonable restraint on alienation.").

Section 4.1 of the PSAs did not restrain the alienation of the working interest that Apache had acquired from Appellants and from Gunn Oil. Rather, Section 4.1 simply dictated that, under certain circumstances, Appellants had the first right to acquire Apache's interest, including the working interest that Apache had originally acquired from Gunn Oil. Accordingly, Section 4.1 did not violate the Rule.

We hold that the trial court erred when it granted summary judgment in favor of Apache and determined that Apache (1) was required to offer to each Appellant only that interest that Apache had originally acquired from that Appellant and (2) was not required to offer to Appellants all of Apache's interest, including the interest originally owned by Gunn Oil, in any lease that, based on a written budgeted drilling commitment, would be lost or released in the next calendar year.

---

[7]The supreme court explicitly agreed with the Sixth Court of Appeals' analysis that a preferential right of first refusal does not violate the Rule. *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 526 (Tex. 1982); *see also ConocoPhillips*, 547 S.W.3d at 869.

E. *Back-In Interest*

Section 2.5 of each PSA provided:

Sellers' Back-In Option. Seller shall have the right, but not the obligation, (the "**Project Back-In Option**") exercisable at Two Hundred Percent (200%) of Project Payout (the "**Back-In Trigger**"), to back-in for up to one-third (1/3rd) of the interests conveyed to Purchaser in and to the Assets hereunder at Closing (such one-third (1/3rd) of Purchaser's interest being the "**Project Back-In Interest**"). If Seller exercises the Project Back-In Option then the Project Back-In Interest shall have a proportionately reduced net revenue interest equal to a proportionately reduced seventy-five percent (75%) net revenue interest. "**Project Payout**" means the first day of the next calendar month following that point in time when the sum of the cumulative Production Income and/or Other Revenues, equals the sum of the Preliminary Purchase Price (after all adjustments pursuant to Articles 2, 5, 6, and 7), the Drilling Credit, the actual costs borne by Purchaser to explore, drill and complete all the wells (whether productive or dry hole) on the Leases (to the extent such costs are attributable to interests which Purchaser acquired in and to the Leases hereunder, but excluding any and all costs associated with other interests which Purchaser may acquire in the Leases), and the actual Operating Costs borne by Purchaser for operation of the Leases and all wells located thereon. "**Production Income**" means the proceeds realized by Purchaser from the sale of oil, gas, liquids, and byproducts produced in conjunction therewith from all wells on the Leases in which Purchaser has an interest (either due to Purchaser's acquisition of an interest pursuant to this Agreement or Purchaser's participation in the drilling and completion thereof, but excluding other interests which Purchaser may otherwise acquire in the Leases), less all royalties, overriding royalties and other burdens on the Leases, less all applicable state severance tax and Operating Costs. "**Other Revenues**" means the proceeds from a sale of any or all of Purchaser's interest in the Leases. "**Operating Costs**" means all actual costs charged or chargeable by the operator under a joint operating agreement having terms identical to the Form of Joint Operating Agreement attached hereto as Exhibit B, along with all actual costs assessed by operator for the acquisition, construction and operation of transportation, processing and marketing infrastructure necessary or proper to market, sell and deliver oil, gas and associated liquids, as well as power infrastructure and saltwater disposal and water

20

source well infrastructure, from wells located on the Leases to the extent such costs are attributable to interests which Purchaser acquired in and to the Leases hereunder, but excluding any and all costs associated with other interests which Purchaser may acquire in the Leases.

Upon achievement of the Back-In Trigger, Seller shall have the option to accept or release all or a portion of the Project Back-In Interest. The Project Back-In Interest shall automatically vest in Seller unless Seller gives written notice of release to Purchaser within thirty (30) days after Seller is notified of the occurrence of the Back-In Trigger. Seller may at any time, at Seller's option, pay Purchaser the remaining balance due for the Back-In Trigger and receive the Project Back-In Interest, as though the Back-In Trigger had occurred.

Apache filed a traditional motion for summary judgment which addressed how to calculate the Back-In Trigger. Apache argued that "200% of Project Payout" meant that "Apache must achieve a 2-to-1 return on its investment in the properties before Appellants could exercise their right to back in." Alternatively, Apache argued that, if "Project Payout," which the parties defined as a day, did not mean "when the revenues generated for Apache by the properties are twice the costs that Apache has incurred in purchasing and developing the properties," then Section 2.5 was too indefinite to enforce. Apache requested that the trial court declare (1) "that each [Appellant] may back in under Section 2.5 only after Apache has achieved a 2:1 return on its investment in the properties that Apache acquired from each [Appellant] under the PSAs," (2) that "all revenues and costs (as defined in the PSA) 'attributable to interests which Apache acquired in and to the Leases' are included in the Back-In Trigger calculation," and (3) that "Project Payout" includes all of the actual costs incurred and not just costs approved by Appellants.

Appellants responded that "Apache promised to transfer to [Appellants] a substantial back-in interest, either when Apache recovered its costs or when [Appellants] chose to exercise an option prior to Apache's 'Project Payout.'"

21

Appellants argued that Apache had requested that the trial court rewrite Section 2.5 to determine as a matter of law that the Back-in Trigger meant "200% of Apache's expenses" rather than "200% of Project Payout." Appellants further contended that the definitions in the PSAs controlled and that Project Payout was not defined as "Apache's expenses."

Although the trial court granted Apache's motion for summary judgment "in all of its particulars," it did not make any of the declarations requested by Apache and did not determine whether Section 2.5 was too indefinite to be enforced. Therefore, we cannot ascertain whether the trial court ruled that Section 2.5 should be enforced based on the construction advanced by Apache or that Section 2.5 should not be enforced at all.

We apply the same rules of interpretation when we construe the meaning of a court order as we do when we ascertain the meaning of other written instruments. *Lone Star Cement Corp. v. Fair*, 467 S.W.2d 402, 404–05 (Tex. 1971) (orig. proceeding); *In re Schlumberger Tech. Corp.*, No. 11-19-00204-CV, 2019 WL 5617632, at *4 (Tex. App.—Eastland Oct. 24, 2019, orig. proceeding) (mem. op.). A court's order is ambiguous if, applying standard rules of construction, it is susceptible to more than one reasonable interpretation. *Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 626 (Tex. 2011) (per curiam). We construe an ambiguous order in light of the motion upon which it was granted. *Harper v. Welchem, Inc.*, 799 S.W.2d 492, 495 (Tex. App.—Houston [14th Dist.] 1990, no writ); *see also Stephens*, 355 S.W.3d at 626 ("Only where an order's terms are ambiguous—that is, susceptible of more than one reasonable interpretation—do we look to the surrounding circumstances to discern their meaning."). As such, "[w]hen an ambiguous order is susceptible to two reasonable constructions, an appellate court should adopt the construction that correctly applies the law." *MacGregor v. Rich*, 941 S.W.2d 74, 75 (Tex. 1997) (per curiam); *see also In re Estate of Moore*, No. 05-

18-00019-CV, 2019 WL 2098477, at *5 (Tex. App.—Dallas May 14, 2019, pet. denied) (mem. op.).

Apache first requested that the trial court construe the meanings of the terms Project Payout and Back-In Trigger. The parties defined (1) Back-In Trigger as "200% of Project Payout" and (2) Project Payout as "the first day of the next calendar month following that point in time" when the sum of certain defined revenue equaled the sum of certain defined expenses. "When terms in a contract are defined, those definitions control the interpretation of the agreement." *Sloane v. Goldberg B'Nai B'Rith Towers*, 577 S.W.3d 608, 618 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see also Sundown Energy LP v. HJSA No. 3, LP*, No. 19-1054, 2021 WL 1323406, at *3 (Tex. Apr. 9, 2021) (per curiam) (holding that, although a court must construe words in context, it cannot interpret a contract so as to clearly ignore defined terms). Because "200% of Project Payout" must be calculated based on the defined terms in Section 2.5, the trial court erred to the extent that it declared that "200% of Project Payout" is based on Apache's "investment in the properties that Apache acquired from each [Appellant] under the PSA."

Apache also requested that the trial court declare that "all revenues and costs (as defined in the PSA) 'attributable to interests which Apache acquired in and to the Leases' are included in the Back-In Trigger calculation" and that "Project Payout" included all of Apache's actual costs and not just costs approved by Appellants. In the PSAs, the parties generally agreed that the calculation of Project Payout included the "actual costs" borne by Apache to explore, drill, and complete wells; the actual costs "charged or chargeable" by Apache under the parties' Joint Operating Agreement (JOA); and the actual costs assessed by Apache for the acquisition, construction, and operation of transportation, processing, and marketing infrastructure; power infrastructure; and saltwater disposal and water source well infrastructure. However, the parties also agreed in Section 4.2 of the PSAs that

Appellants had the right to audit Apache's books and records relating to the Project Payout and to the Back-in Trigger and to "request adjustments thereto." Further, as Apache conceded in its motion for summary judgment, Appellants had the right to timely except to costs charged under the JOA pursuant to the JOA's audit procedure. Therefore, a genuine issue of material fact exists as to whether any of Apache's costs should be excluded from the Project Payout and Back-In Trigger calculations. Accordingly, we hold that the trial court erred when it granted summary judgment in favor of Apache to the extent that it declared that "all revenues and costs" are included in the calculation of the Back-In Trigger or that Project Payout included all actual costs and not just costs approved by Appellants.

Because Apache failed to establish that it was entitled to judgment as a matter of law to the declarations that it requested, we now turn to whether the trial court correctly applied the law when it determined that Section 2.5 of the PSAs was too indefinite to be enforced.[8]

"To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer*, 479 S.W.3d at 237 (quoting *Pace Corp. v. Jackson*, 284 S.W.2d 340, 345 (Tex. 1955)). A contract's "essential or material terms" are those that the parties would reasonably regard as vitally important parts of their bargain. *Id.* Material or essential terms are determined on a case-by-case basis. *Id.* Moreover, "[a] contract is sufficiently definite if a court is able to determine the material legal obligations of the parties."

---

[8]In their opening brief, Appellants did not specifically challenge the trial court's alternative ruling that Section 2.5 was too indefinite to be enforced. Rather, Appellants argued that Section 2.5 was unambiguous and should be construed based on the defined terms as agreed to by the parties and that enforcing Section 2.5 as written was neither meaningless nor unreasonable. A challenge to the trial court's alternative ruling that Section 2.5 was too indefinite to be enforced was "fairly included" in Appellants' arguments. *See St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 213–14 (Tex. 2020) (per curiam) (holding that, because an issue statement should be treated "as covering every subsidiary question that is fairly included," "appellate courts should reach the merits of an appeal whenever reasonably possible") (first quoting Tex. R. App. P. 38.1(f); then quoting *Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 162 (Tex. 2012)).

*Abatement Inc. v. Williams*, 324 S.W.3d 858, 861 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *see also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook.").

Courts "should be reluctant to hold a contract unenforceable for uncertainty," and should construe the contract "in such a manner as to render performance possible rather than impossible." *Marx v. FDP, LP*, 474 S.W.3d 368, 376 (Tex. App.— San Antonio 2015, pet. denied) (quoting *Guzman v. Acuna*, 653 S.W.2d 315, 319 (Tex. App.—San Antonio 1983, pet. dism'd)); *see also Fischer*, 479 S.W.3d at 239 ("[W]e will find terms to be sufficiently definite whenever the language is reasonably susceptible to that interpretation."). "Expressions that at first appear incomplete or uncertain are often readily made clear and plain by the aid of common usage and reasonable implications of fact." *Fischer*, 479 S.W.3d at 239 (quoting *Bendalin v. Delgado*, 406 S.W.2d 897, 900 (Tex. 1966)).

As relevant to this issue, the material and essential terms of the parties' agreement were that each Appellant had a right to back-in for one-third of the interest that it conveyed to Apache (1) when the Back-In Trigger occurred or (2) at any time by paying the remaining balance due to reach the Back-in Trigger. The Back-In Trigger was defined as 200% of Project Payout, and Project Payout occurred on the first day of the month after certain defined costs equaled certain defined revenue.

The parties do not dispute these material and essential terms. Rather, they disagree about the meaning of the defined terms included in their agreements. In its motion for summary judgment, Apache argued that Appellants were not entitled to exercise the back-in option until Apache had achieved a 2:1 return on its investment in the properties that Apache acquired under the PSAs. Appellants responded that they were entitled to back-in to the project (1) when Project Payout occurred or (2) when they chose to exercise a contractual option prior to Project Payout. Here,

25

the parties' differing interpretations as to the language in their agreements does not establish that the agreements are too indefinite to be enforced.

We hold that Apache failed to establish as a matter of law that it was entitled to the requested declarations or that Section 2.5 of the PSAs was too indefinite to be enforced. Therefore, the trial court erred when it granted Apache's traditional motion for summary judgment on how to calculate the Back-In Trigger.

F. *Expiration of North Block Lease*

Both Patterson and Huddleston opined as to the damages that Appellants allegedly sustained when Appellants were not offered Apache's interest in the Bivins Ranch North Block before that lease was lost or released. Patterson calculated damages based on the North Block lease expiring on January 1, 2016, while Huddleston calculated damages based on the North Block lease expiring on December 31, 2015. In Huddleston's opinion, if the North Block lease expired on December 31, 2015, Apache would have been required to offer that lease to Appellants on November 1, 2014, rather than November 1, 2015, thereby substantially increasing Appellants' alleged damages by approximately $187,000,000.[9]

Apache filed a combined traditional and no-evidence motion for summary judgment and requested that the trial court determine that the North Block lease expired on January 1, 2016. Apache specifically argued that Appellants had judicially admitted that the North Block lease expired on January 1, 2016; that the unambiguous language of the Bivins Ranch lease demonstrated that the North Block lease expired on January 1, 2016; that the amendments to the Bivins Ranch lease did not change the expiration date; and that a post-termination release did not impact the

---

[9]In valuing the leases, both Patterson and Huddleston considered the price of oil on the valuation date. Between November 1, 2014 and November 1, 2015, the price of West Texas Intermediate traded at Cushing, Oklahoma dropped from $80.53 a barrel to $46.60 a barrel. *See* https://www.eia.gov/dnav/pet/hist/RWTCD.htm (last visited on June 7, 2021).

expiration date. Apache also asserted (1) that Appellants had no evidence that Apache's October 31, 2014 written budgeted drilling commitment for drilling operations in 2015 either contemplated or resulted in the loss or release of the North Block lease in 2015 and (2) that, if the trial court granted Apache's pending motion to exclude Huddleston's testimony, Appellants could not produce any evidence of damages.

In response, Appellants asserted (1) that Apache and the lessors had executed, notarized, and recorded a release that established that the North Block lease terminated in 2015; (2) that the primary term of the Bivins Ranch lease expired before Apache ever acquired an interest in the lease; (3) that the North Block lease automatically terminated when Apache ceased to comply with the continuous drilling obligation on the North Block in 2015; and (4) that Apache had presented no summary judgment evidence as to when it contended that the North Block lease terminated for want of continuous drilling. Appellants further asserted that fact issues existed as to the expiration date of the North Block lease that precluded traditional summary judgment in Apache's favor, that Apache's no-evidence motion for summary judgment was insufficient as a matter of law because it failed to state the element of a claim for which there was no evidence, and that more than a scintilla of evidence existed to defeat the no-evidence motion for summary judgment. We agree with Appellants.

The Bivins Ranch lease was signed by Cogent, as the lessee, and a number of lessors that we will refer to collectively as the Bivins Family. The Bivins Ranch lease had a primary term of three years from the effective date of January 1, 2007. Cogent and the Bivins Family agreed that the lease would not be recorded in the county deed records. Rather, Cogent and the Bivins Family acknowledged in the lease that they had executed a Memorandum of Lease that would be filed in the

27

county deed records to provide record notice of the lease.[10]  In the Memorandum, Cogent and the Bivins Family stated that the primary term of the lease became effective on January 1, 2007, and expired on December 31, 2009.

After the primary lease term expired, the Bivins Ranch lease "continue[d] in force . . . so long as production continue[d] in paying quantities or operations [were] conducted" as provided by the lease.  If the lessee drilled a producing well during the primary term, it had the option to divide the lease into three blocks of equal size and to "continue the Lease in force by conducting continuous operations on each designated block."  "[C]ontinuous drilling operations on each designated block" was defined as "the commencement of a well on each block and the actual drilling by Lessee of 20,000 feet in one or more wells on each block each year after the expiration of the Primary Term."  When the lessee "cease[d] to comply with this continuous drilling obligation on any block," it was required to "release this Lease with respect to all products not then being produced in commercial quantities in that block" and the lease then "automatically terminate[d] as to all lands within that block as to all depths covered by this Lease outside the proration unit assigned to a drilling or producing well."

Before the expiration of the primary term, Appellants and Gunn Oil drilled a producing well and divided the Bivins Ranch lease into three equal blocks: the North Block, the South Block, and the East Block.  In 2010, Gunn Oil, Appellants, and the Bivins Family executed an Amendment to the lease and agreed that the lessee could extend the entire Bivins Ranch lease for another year if it drilled a total of 60,000

---

[10]"[T]he modern practice in the oil and gas industry is for a memorandum of lease to be filed in the public records in lieu of the actual oil and gas lease in order to preserve the confidentiality of lease terms." *MEI Camp Springs, LLC v. Clear Fork, Inc.*, No. 11-19-00048-CV, 2021 WL 1584815, at *6 (Tex. App.—Eastland Apr. 23, 2021, no pet. h.); *see also Grayco Town Lake Inv. 2007 LP v. Coinmach Corp.*, No. 03-15-00088-CV, 2016 WL 7335862, at *4 & n.18 (Tex. App.—Austin Dec. 16, 2016, no pet.) (mem. op.) (noting that a memorandum of lease provides at least inquiry notice of the lease) (citing *Memorandum*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("An informal written note or record outlining the terms of a transaction or contract.")).

feet anywhere on the lease. After Apache became the operator on the Bivins Ranch lease, it, Gunn Oil, Appellants, and the Bivins Family executed similar amendments each year between 2011 and 2014. Each amendment expired on December 31 of the applicable year. The Sixth Amendment, which became effective on January 1, 2014, provided that it would expire on December 31, 2014, and that "[e]ffective as of 12:01 a.m. on January 1, 2015," the lease would "revert to its original wording and shall remain as such for the remainder of the term of the Lease unless otherwise modified or amended."

On October 30, 2014, Apache provided to Appellants a written budgeted drilling commitment for 2015 in which Apache stated that it would drill 60,000 feet on the Bivins Ranch lease in 2015. However, Apache could not reach an agreement with the Bivins Family on a Seventh Amendment to the Bivins Ranch lease and, therefore, could only perpetuate the North Block lease in 2015 if it drilled 20,000 feet on that block. Apache did not drill 20,000 feet on the North Block in 2015. On December 3, 2015, Dallas Martin, a landman employed by Apache, informed Appellants that it was "possible" that the North Block lease would expire "at the end of this year." On August 16, 2016, Apache filed in the county deed records a release of the North Block lease. The release was dated March 1, 2016, but was effective as of December 31, 2015.

The trial court granted Apache's motion for summary judgment without stating the basis for its ruling and ordered (1) that the North Block lease expired on January 1, 2016, and (2) that the damages associated with the North Block lease, if any, must be calculated as of November 1, 2015. The trial court also granted Apache's request to exclude Huddleston as an expert to the extent that Huddleston's intended testimony related to an expiration date on the North Block lease other than January 1, 2016.

Appellants first assert that the trial court erred if it granted Apache's no-evidence motion for summary judgment on any claim that was based on the expiration date of the Bivins Ranch lease because the no-evidence motion for summary judgment was not specific. Apache moved for summary judgment on the ground that Appellants had no evidence on their "new claim that Apache should have offered the North Block on or before November 1, 2014." However, Apache did not specify the cause of action, or the elements of that cause of action, against which the no-evidence assertion was directed. Therefore, Apache's no-evidence motion for summary judgment based on the expiration date of the Bivins Ranch lease was legally insufficient and should not have been granted. *See Humphrey v. Pelican Isle Owners Ass'n*, 238 S.W.3d 811, 813–14 (Tex. App.—Waco 2007, no pet.) (holding that a no-evidence motion for summary judgment that does not specifically state the elements as to which there is allegedly no evidence is legally insufficient as a matter of law); *see also* TEX. R. CIV. P. 166a(i) cmt. (explaining that the "motion must be specific in challenging the evidentiary support for an element of a claim" and that "conclusory motions or general no-evidence challenges to an opponent's case" are insufficient).

Apache also moved for a no-evidence summary judgment on Appellants' claims that Apache failed to comply with Section 4.1 on the ground that, if the trial court excluded Huddleston's testimony in its entirety, Appellants could produce no evidence of damages as a result of Apache's alleged failure to comply with Section 4.1. However, the trial court's exclusion of Huddleston's proposed testimony was limited only to the opinions he intended to express based on the North Block lease expiring on any day other than January 1, 2016. Because the remainder of Huddleston's intended opinions constituted more than a scintilla of evidence of Appellants' alleged damages, we hold that the trial court erred to the extent that it

30

granted Apache's no-evidence motion for summary judgment on the ground that Appellants had no evidence of damages.

In its traditional motion for summary judgment, Apache first argued that it was entitled to judgment as a matter of law because Appellants had judicially admitted that the North Block lease expired on January 1, 2016. In support of its motion, Apache specifically referred to statements made by Appellants in their response to Apache's traditional motion for summary judgment on the construction of Section 4.1 of the PSAs and to Appellants' alleged "quasi-admissions" that were made in their corporate representative's position paper, in deposition testimony by Appellants' corporate representative, in deposition testimony by individuals associated with Appellants, in Patterson's deposition testimony, and in Appellants' interrogatory responses.

A judicial admission is "a formal waiver of proof usually found in pleadings or the stipulations of the parties." *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980); *see also Grothe v. Grothe*, No. 11-14-00084-CV, 2016 WL 1274059, at *2 (Tex. App.—Eastland Mar. 31, 2016, no pet.) (mem. op.). The consequences of a judicial admission are that the admitted fact is conclusively established, the opposing party is relieved of the burden of proving the admitted fact, and the admitting party is barred from later disputing that fact. *Mendoza*, 606 S.W.2d at 694; *Grothe*, 2016 WL 1274059, at *2. However, a party waives the right to rely upon an opponent's judicial admission if the party fails to object to the introduction of contradictory evidence. *Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989); *Houston First Am. Savs. v. Musick*, 650 S.W.2d 764, 769 (Tex. 1983) ("The party relying on his opponent's pleadings as judicial admissions of fact, however, must protect his record by objecting to the introduction of evidence contrary to that admission of fact."); *WorldVentures Mktg., LLC v. Travel to Freedom, LLC*, No. 05-

20-00169-CV, 2020 WL 5651657, at *3 (Tex. App.—Dallas Sept. 23, 2020, no pet.) (mem. op.).

Here, Apache failed to object when Appellants introduced as summary judgment evidence (1) the Memorandum in which the parties to the lease stated that the primary term of the Bivins Ranch lease expired on December 31, 2009, (2) the recorded release of the North Block lease that was effective as of December 31, 2015, and (3) the statement by Martin that the North Block would possibly expire at the end of 2015. When it failed to object when Appellants placed the expiration date of the North Block lease at issue, Apache waived its right to rely on any judicial admissions or quasi-admissions that were allegedly made by Appellants. *See Willowbrook Foods, Inc. v. Grinnell Corp.*, 147 S.W.3d 492, 502–03 (Tex. App.—San Antonio 2004, pet. denied) (holding that, in the context of a motion for summary judgment, a party can waive the right to rely on an opposing party's admissions by failing to object to the introduction of controverting evidence); *see also Stephens v. Precision Drilling Oilfield Servs. Corp.*, No. 01-11-00326-CV, 2013 WL 1928797, at *10 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (mem. op.); *Smith v. Altman*, 26 S.W.3d 705, 708–09 (Tex. App.—Waco 2000, pet. dism'd w.o.j.). *But see Beasley v. Burns*, 7 S.W.3d 768, 769–70 (Tex. App.—Texarkana 1999, pet. denied) (declining to extend the *Marshall* rule to summary judgment proceedings).

Apache also asserted that it was entitled to summary judgment that the North Block lease expired on January 1, 2016, because (1) the unambiguous language of the Bivins Ranch lease demonstrated that the North Block lease expired on January 1, 2016, (2) the amendments to the Bivins Ranch lease did not change the expiration date, and (3) the post-termination release did not impact the expiration

32

date. Apache argued that, pursuant to the rules of contract construction,[11] the use of the words "from" or "after" a particular date in a contract means that the anniversary date of the contract is included in the contract term. To support its arguments, Apache relied on provisions in the Bivins Ranch lease: (1) that the effective date of the lease was January 1, 2007, "from which the anniversary dates of this Lease shall be computed"; (2) that the primary term of the lease would be "three years from the effective date"; and (3) that after the primary term, the lessee could continue the lease by "conducting continuous drilling operations," which was defined as the commencement of a well and the actual drilling of 20,000 feet on each block "each year after the expiration of the primary term." Apache asserted that, because the primary term of the Bivins Ranch lease expired on January 1, 2010, and all anniversaries of the lease terms were computed from that date, its compliance with the continuous drilling operations provision of the Bivins Ranch lease in 2014 extended the entire lease until January 1, 2016.

It is an established rule in Texas that, "when time is to be computed from or after a certain day or date, the designated day is to be excluded and the last day of the period is to be included unless a contrary intent is clearly manifested by the contract." *Home Ins. Co., N.Y. v. Rose*, 255 S.W.2d 861, 862–63 (Tex. 1953); *In re Estate of Montemayor*, No. 04-09-00552-CV, 2010 WL 2844047, at *3 (Tex. App.—San Antonio July 21, 2010, no pet.) (mem. op.). The Bivins Ranch lease provided that the lease became effective on January 1, 2007, and that the primary term of the lease was to be three years from the effective date. However, the recorded Memorandum of Lease was executed at the same time as the Bivins Ranch lease, and it was specifically referenced in the lease. Therefore, these two documents

---

[11] "Mineral leases are contracts and as such are interpreted using the same rules that are applied in interpreting other types of contracts." *TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 462 (Tex. 2018).

must be construed together. *See Kroger Co. v. J. Weingarten, Inc.*, 380 S.W.2d 145, 150 (Tex. App.—Houston 1964, writ ref'd n.r.e.) (holding that a lease, a memorandum of lease, and a restrictions agreement that were all executed contemporaneously and pursuant to the agreement of all the parties were "inseparably linked together and must be construed as a combined agreement").

Cogent and the Bivins Family filed the Memorandum in the county deed records and gave record notice that the primary term of the Bivins Ranch lease expired on December 31, 2009. Subsequently, the parties to the Bivins Ranch lease agreed that each amendment of the lease would expire on December 31 of the applicable year. Further, Martin, Apache's employee, represented that the North Block lease would possibly expire at the end of 2015, and Apache signed and filed a release of the North Block lease that was effective December 31, 2015.

In light of the summary judgment evidence, and the record before us, genuine issues of material fact exist as to whether Cogent and the Bivins Family expressly agreed that the primary term of the Bivins Ranch lease expired on December 31, 2009, and as to whether the North Block lease either expired or was released in 2015. Therefore, we hold that the trial court erred when it (1) granted Apache's traditional motion for summary judgment; (2) declared that the North Block lease expired on January 1, 2016, as a matter of law; and (3) ordered that Huddleston was precluded from testifying as to Appellants' damages, if any, if such testimony was based on an expiration date of the North Block lease other than January 1, 2016.

G. *Breach of Express Trust, Breach of Fiduciary Duty, and Misapplication of Fiduciary Property Resulting in a Constructive Trust*

Appellants asserted claims against Apache for breach of express trust, breach of fiduciary duty, and misapplication of fiduciary property based on Section 4.1 of the PSAs. Appellants specifically alleged (1) that Section 4.1 created an express trust for Appellants' benefit with respect to Apache's interest in the 109 leases;

34

(2) that the express trust created a fiduciary relationship between Apache and Appellants; and (3) that Apache breached its fiduciary duties when it failed to timely offer its lease interests to Appellants, allowed its interests in the leases to terminate, and reacquired leases that had been lost without assigning its interests in the reacquired leases to Appellants.

Apache filed a combined traditional and no-evidence motion for summary judgment challenging Appellants' claims on the grounds (1) that any claim based on conduct that occurred before March 18, 2012, was barred by the statute of limitations; (2) that the parties' contracts established that the parties did not intend to create trust or fiduciary relationships; and (3) that Appellants could produce no evidence that an express trust was created, that Apache owed any fiduciary duty to Appellants, that Apache breached any express or fiduciary duty, or that Appellant sustained any damages as a result of any such alleged breach.

In their response to Apache's traditional motion for summary judgment, Appellants asserted (1) that, pursuant to Section 4.1 of the PSAs, the parties created an express trust because "[t]here was a separation of legal title from [Appellants'] beneficial interest in the 'ability to perpetuate'" any of the 109 leases that would be lost or released and (2) that Apache was required to preserve the 109 leases so that Appellants would have the "option and ability to perpetuate" the leases. Appellants further asserted that, based on the existence of an express trust, Apache owed Appellants a fiduciary duty.

The trial court granted Apache's motion without stating a basis for its ruling. Because Apache was entitled to summary judgment on the ground that the parties' contracts created neither an express trust nor a fiduciary relationship, we address Apache's second ground for traditional summary judgment first. *See Womack*, 2019 WL 3023516, at \*2; *see also* TEX. R. APP. P. 47.1.

To prevail on a breach-of-fiduciary-duty claim, the plaintiff must establish: (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). A fiduciary relationship may be formal or informal. *Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) (per curiam). In certain formal relationships, including a trustee relationship, a fiduciary duty arises as a matter of law. *Bombardier Aerospace*, 572 S.W.3d at 220.

"A trust is created only if the settlor manifests, in writing, an intention to create a trust." *Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417, 433 (Tex. 2020), *cert. denied*, No. 20-536, 2021 WL 666393, at *1 (Feb. 22, 2021); *see also* TEX. PROP. CODE ANN. § 112.004 (West 2014). Although "[t]echnical words of expression" are not essential, the beneficiary, the res, and the trust purpose must be identified. *Perfect Union Lodge No. 10, A.F. & A.M., of San Antonio v. Interfirst Bank of San Antonio, N.A.*, 748 S.W.2d 218, 220 (Tex. 1988); *ETC Tex. Pipeline, Ltd. v. Addison Expl. & Dev., LLC*, 582 S.W.3d 823, 840 (Tex. App.—Eastland 2019, pet. denied). "[W]hen a valid trust is created, the beneficiaries become the owners of the equitable or beneficial title to the trust property and are considered the real owners." *Bradley v. Shaffer*, 535 S.W.3d 242, 248 (Tex. App.—Eastland 2017, no pet.) (quoting *City of Mesquite v. Malouf*, 553 S.W.2d 639, 644 (Tex. App.—Texarkana 1977, writ ref'd n.r.e.)); *see also Perfect Union Lodge*, 748 S.W.2d at 220 ("The separation of the legal and equitable estates in the trust property is the basic hallmark of the trust entity.").

After the PSAs were executed, Apache owned 73.5% of the working interest in the 109 leases listed in the PSAs. Pursuant to Section 4.1, Apache had a contractual duty to prepare a written budgeted drilling commitment by November 1 for the following calendar year. If that commitment either contemplated or would result in the loss or release of any of the 109 leases in the next calendar year, Apache

36

would then be contractually required to offer its interest in those leases to Appellants so that Appellants would have the option and ability to perpetuate the leases. Although Appellants had a contractual right to accept any offered assignment, it had no obligation to do so. However, if Appellants did accept an assignment, Apache was then required to transfer title to the working interest in the leases to Appellants.

After reviewing the language used in the PSAs, we can discern no intent by the parties to separate the legal title of the leases from any beneficial interest held by Appellants, including the "ability to perpetuate the leases" or to create an express trust for the benefit of Appellants. Apache, therefore, did not owe any fiduciary duty to Appellants based on the alleged existence of an express trust. Accordingly, we hold that the trial court properly granted summary judgment in Apache's favor on Appellants' claims for breach of express trust, breach of fiduciary duty, and misapplication of fiduciary property.[12]

H. *Conclusion*

With the exception of Appellant's challenge to the trial court's grant of summary judgment in favor of Apache on Appellants' tort claims, which we address later in this opinion, we overrule Appellants' first issue in part and sustain Appellants' first issue in part. We overrule Appellants' first issue to the extent that Appellants challenge the trial court's summary judgment orders (1) on the meaning and interpretation of Leases and affected Leases in Section 4.1 of the PSAs and (2) that dismissed Appellants' claims for breach of express trust, breach of fiduciary

---

[12]On appeal, Appellants also argue that, pursuant to the Bivins Ranch lease, the lessees owed a fiduciary duty to the Bivins Family to "reasonably explore and develop the land" and to "notify Lessors of any event affecting lease continuation or termination." Appellants assert that, because they continued to own an interest in the leases after the PSAs were signed, they continued to owe this fiduciary duty to the Bivins Family. Appellants contend that, because of the fiduciary obligations that they owed to the Bivins Family, Section 4.1 of the PSAs required that Apache disclose to Appellants the same information that Appellants would have been duty bound to disclose to the Bivins Family. However, Appellants neither raised this argument in their response to Apache's motion for summary judgment nor relied on the Bivins Ranch lease as summary judgment evidence.

duty, and misapplication of fiduciary property. We sustain Appellants' first issue to the extent that Appellants challenge the trial court's summary judgment orders and determinations (1) on how to account for the working interest originally owned by Gunn Oil, (2) on how to calculate the Back-In Trigger, and (3) on the expiration date of the North Block lease.

## III. *Exclusion of Expert Witnesses*

In their second issue, Appellants complain that the trial court erred when it granted Apache's motions to exclude the expert opinions and testimony of Patterson, Huddleston, and Graves.

### A. *Standard of Review*

The trial court has broad discretion in its determination of the admissibility of expert testimony. *Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 262 (Tex. 2012). The trial court abuses its discretion only if it acts without regard for guiding rules or principles. *Id.* As such, our review requires that we "must uphold the trial court's decision to exclude evidence if there is any legitimate basis for the ruling." *Id.* at 264 (alterations in original omitted) (quoting *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)).

### B. *Admissibility of Expert Testimony*

Under Rule 702 of the Texas Rules of Evidence, a qualified expert may offer opinion testimony if that testimony is both relevant and based on a reliable foundation. *Id.* at 262; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also* TEX. R. EVID. 702. When an opposing party objects to proffered expert testimony, the proponent of the expert testimony has the burden to demonstrate its admissibility. *Robinson*, 923 S.W.2d at 556. Because jurors may place great weight on expert testimony, trial judges have a heightened responsibility to ensure that expert testimony, to be admissible, is both relevant and reliable. *Id.* at 553–54.

To be relevant, the expert's opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002) (quoting *Robinson*, 923 S.W.2d at 556); *see also State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). "Evidence that has no relationship to any issue in the case does not satisfy" the requirements of Rule 702. *Zwahr*, 88 S.W.3d at 629.

To determine whether an expert's opinions are reliable, we examine the principles, research, and methodology underlying the expert's conclusions. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006).[13] "[E]ach material part of an expert's theory must be reliable." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009). "If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005) ("[I]f an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded.").

Expert testimony also is unreliable "if there is too great an analytical gap between the data on which the expert relies and the opinions offered." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015) (quoting *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904–05 (Tex. 2004)). "Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion." *Id.* Analytical gaps may include

---

[13]In *Robinson*, the supreme court suggested six factors that courts may consider to assess reliability: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies on the expert's subjective interpretation; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the relevant scientific community has accepted as valued the underlying theory or technique generally; and (6) the nonjudicial uses made of the theory or technique. *Robinson*, 923 S.W.2d at 557. However, these factors are nonexclusive and do not fit every scenario. *See TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 235 (Tex. 2010); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1988).

circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached by the expert. *Id.*

Neither we nor the trial court may decide if the expert's opinion is correct. *Id.* Rather, the issue is whether the analysis that is used to formulate those opinions is reliable. *Id.* When, as in this case, the expert opines as to the fair market value of property, the proper inquiry is whether the utilized appraisal method as a whole constitutes relevant and reliable evidence of market value. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001). "If an appraiser utilizes improper methodology or misapplies established rules and principles, the resulting testimony is unreliable and must be excluded." *Enbridge Pipelines*, 386 S.W.3d at 262; *see also Gharda*, 464 S.W.3d at 347–48 (holding that it is an abuse of discretion for a court to admit expert testimony that does not meet the reliability requirements).

C. *Patterson*

Appellants first assert that the trial court abused its discretion when it granted Apache's motion to exclude Patterson, Appellants' first expert on damages, and later denied Appellants' motion to reconsider this ruling, because Patterson was qualified to offer opinion testimony and had used a generally accepted methodology to formulate his opinions as to the value of the oil and gas interests in dispute. Appellants argue that Apache's complaints about Patterson's opinions went to the weight, rather than the admissibility, of the testimony.

In response to six questions propounded by Appellants, Patterson used and relied on the discounted cash flow methodology to calculate Appellants' claimed damages. Appellants' first five questions to Patterson asked that he calculate the damages caused by Apache's alleged failure to offer to Appellants all "affected Leases." Appellants further requested that Patterson calculate alternative damages

based on different assumptions about which of the 109 leases were "affected Leases" as of different dates. Depending on the leases that he assumed fell within the "affected Leases," Patterson opined that the fair market value of the "affected Leases" (1) was either $304,517,000 or $528,355,000 on November 1, 2011, and (2) was either $27,665,000 or $44,078,000 on November 1, 2012. As a further alternative, Patterson opined that the fair market value of the "affected Leases" was $7,362,000 on November 1, 2015. In response to Appellants' sixth question, Patterson opined that the fair market value of Appellants' back-in interest was $161,946,000 on October 1, 2013.

Apache filed a motion to exclude Patterson's testimony on the ground that his opinions were neither relevant nor reliable. Apache specifically complained that Patterson (1) ignored comparable transactions, (2) impermissibly relied on data that could not have been considered by willing buyers and willing sellers at the relevant times, and (3) inflated his valuations by assuming incorrect facts about one of the geological formations located within the leases.

At the hearing on the motion to exclude, Patterson testified that, in the development of oil and gas, there are "conventional" plays and "unconventional" or "resource" plays. Conventional plays involve reserves in individual oil and gas "traps," while resource plays involve reserves that are located "pretty much contiguously across the block." Conventional and resource plays are on the opposite ends of the spectrum with a gradation between the two types of plays. A "pure" conventional play is valued much differently than a resource play and includes a consideration of whether the reserves in a particular location were proven, probable, possible, or prospective. A resource play, however, is valued based on the level of activity in a business plan.

The Canyon Lime and the Canyon Wash are different geological formations and both formations exist on the acreage covered by the leases at issue in this case.

41

Between 2011 and 2014, Apache was developing the Canyon Wash formation as a conventional play through the drilling of vertical wells. In 2014, Apache shifted to developing the Canyon Lime formation as a resource play through horizontal drilling activities. Patterson acknowledged that the Canyon Wash formation did not meet all the criteria of a resource play. However, because Patterson believed that the Canyon Wash formation had "a lot of the characteristics of a resource play," he valued the Canyon Wash as if it were a resource play.

Patterson testified that between 85% and 90% of the valuations of oil and gas interests are performed using the discounted cash flow methodology and that he used that methodology to value the leases at issue in this case. To perform the valuation, Patterson used the expected cash flow from the operations set out in a business plan and then discounted that cash flow. The value of the oil and gas interest was then determined as a "certain portion" of that discounted cash flow.

Patterson specifically testified as to how he calculated a fair market value for the leases in 2011. As the factual basis for his opinion, Patterson relied on information that was included in a 2011 Apache investor presentation about the number of wells that Apache planned to drill in the Canyon Wash formation between 2011 and 2015, the type curve of the production that Apache expected from the wells, and the costs to drill and complete a well. Patterson generated a discounted cash flow in 2011 based on that business plan. Because Apache's plan would develop only approximately 4,000 acres, Patterson applied a residual undeveloped acreage value to the remaining acreage to determine a total value.

Patterson then calculated the present value of the cash flow by discounting each year's cash flow by 10% per year. Patterson used the discounted cash flow as of November 1, 2011, to calculate the "technical" value of the leases. Because the fair market value of property is typically a discount to the technical value, Patterson used a 75% fair market value adjustment factor to determine the fair market value

of the leases. Finally, Patterson reduced the fair market value to reflect that Apache held only a 73.5% working interest in the leases.

Patterson calculated the 75% fair market value adjustment factor based on information about the development of the leases that was included in a November 2014 Apache investor presentation. In that presentation, Apache outlined its plan to drill 800 horizontal wells in the Canyon Lime formation. Apache also set out the expected type curve profile for those wells and the expected costs to drill the 800 wells. Based on the information in the 2014 investor presentation, Patterson calculated that the proposed drilling program would generate a cash flow of approximately $3.9 billion. He discounted that cash flow by ten percent per year to obtain a discounted cash flow of $1.186 billion. The discounted cash flow analysis provided a technical value for the leases in 2014 to be approximately $9,123 per acre.

Patterson then considered Apache's acquisition in 2014 of Gunn Oil's remaining interest in the 109 leases and of another company's interest in leases that were located on contiguous acreage. Patterson testified that, after adjustments for production, Apache paid approximately $6,673 per acre for the interest it acquired from Gunn Oil. Apache also paid $7,000 per acre for the leases on the contiguous acres. In Patterson's opinion, based on the average per acre value of the two 2014 transactions, in 2014 Apache paid approximately 75% of the calculated technical value for the leases.

Using the same methodology, Patterson relied on information in Apache's 2012 and 2013 investor presentations to calculate the technical value for the leases for each year. Patterson then used the 75% fair market value adjustment factor to determine the fair market value of the leases in 2012 and 2013. However, because of a collapse in oil prices in early 2015, Patterson applied a "very high discount

factor" when he calculated the fair market value of the leases as of November 1, 2015.

Patterson opined that the fair market value of Apache's interest in the leases was $5,904 per acre on November 1, 2011; $10,520 per acre on November 1, 2012; and $398 per acre on November 1, 2015. He also opined that the fair market value of Appellants' back-in interest was $10,206 per acre on October 1, 2013.

On September 25, 2017, the trial court granted Apache's motion to exclude Patterson's testimony. On March 15, 2019, Appellants filed a motion to reconsider the trial court's ruling. Appellants asserted that, in 2018, Apache assigned to Appellants those portions of the 109 leases in which Apache still held an interest. After Appellants became the operator on these leases, they learned that Apache had requested that the Texas Railroad Commission designate a 2,082 vertical feet interval that included both the Canyon Wash and the Canyon Lime formations as one field. Appellants contended that Apache, therefore, was estopped from arguing that Patterson could not rely on data related to the Canyon Lime in forming his opinion as to the value of the leases. After a hearing, the trial court denied Appellants' motion to reconsider.

Fair market value is the price a willing buyer will pay to a willing seller when neither is acting under any compulsion. *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 388 (Tex. 2021). An appraisal method used to determine fair market value "is only valid if it produces an amount that a willing buyer would actually pay a willing seller." *Sharboneau*, 48 S.W.3d at 183. "In the 'willing seller–willing buyer test' of market value, all factors should be considered that would reasonably be given weight in negotiations between a seller and a buyer." *City of Sugar Land v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 512 (Tex. App.—Eastland 2007, pet. denied); *see also City of Austin v. Cannizzo*, 267 S.W.2d 808, 814 (Tex. 1954).

The discounted cash flow, or income, methodology used by Patterson is a recognized methodology to determine the fair market value of real property. *Sharboneau*, 48 S.W.3d at 182 ("The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method."); *see also State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 172 (Tex. 2009) (per curiam) ("The income approach consists of estimating the net operating income stream of a property and applying a capitalization rate to determine the property's present value."). Generally, the use of the discounted cash flow methodology "is appropriate when property would, in the open market, be priced according to the income that it already generates." *Sharboneau*, 48 S.W.3d at 183. Evidence of future income that is used to determine fair market value "must be based on objective facts, figures, or data" and should not be "hypothetical or hopeful." *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 279 (Tex. 2015). Furthermore, the expert's valuation must also account for "basic marketplace realities." *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 789 (Tex. 2020).

Patterson utilized the discounted cash flow methodology to calculate the value per acre of the leases on November 1, 2011; November 1, 2012; October 1, 2013; and November 1, 2015. Patterson acknowledged that, in conducting his analysis, he was required to consider (1) what buyers and sellers in the market at the relevant time would consider and (2) that his valuation should be restricted to data that would have been known by or available to willing buyers and willing sellers as of the valuation date. Patterson, however, relied on information from the 2014 Apache investor presentation and from the two acquisitions by Apache in 2014 to calculate the fair market value adjustment factor that he used to determine the fair market value of the leases in 2011, 2012, and 2013.

Patterson admitted that he used data to value the leases in 2011, 2012, and 2013 that would not have been available to willing buyers and sellers in those

45

specific years. Nevertheless, in Patterson's opinion, the application of a 75% fair market adjustment factor between 2011 and late 2014 was also supported by (1) the market "for these plays like -- that has the characteristics of this" being "extremely aggressive" and "fairly stable," and the "transaction prices for acreage in unconventional resource play" being at a "high sustained value"; (2) the prices paid in other transactions for large acreages between 2011 and 2014; and (3) his use of the same 75% fair market value adjustment factor to value other properties between 2010 and 2014.

As to market conditions, Patterson testified that, between 2010 and 2014, there was a "very active and aggressive market in the oil and gas business." According to Patterson, there were "a number of emerging unconventional resource plays" and "[t]here was a tremendous amount of capital infusion into the business to acquire leasehold in that play." Patterson testified that there was "very aggressive competition to acquire especially large lease blocks in any potential unconventional resource play or a play that looked like it might be an unconventional resource play" and that "the transaction prices for acreage in unconventional resource play was very high" and had a "high sustained value."

However, between 2011 and 2013, Apache developed the Canyon Wash formation as a conventional play through the drilling of vertical wells. Patterson admitted that conventional plays are valued differently than resource plays. Therefore, even if we credit Patterson's testimony that there was an "aggressive" market between 2010 and 2014 for resource plays or plays that were similar to resource plays, and that leases in such plays commanded high values, Patterson did not explain how that market affected (1) the value of a conventional play or (2) the value of a play that had some of the characteristics of a resource play but was being developed as a conventional play. Patterson also failed to explain why a fair market value adjustment factor based on an investor presentation that set forth the proposed

46

development of a resource play could be used to value either (1) a conventional play or (2) a play that had some of the characteristics of a resource play but that was being developed as a conventional play.

Patterson also testified that transactions for other properties that occurred between 2010 and 2014 supported the fair market value for the leases that he calculated using the 75% fair market value adjustment factor. Patterson relied on thirteen transactions, six in 2011, two in 2012, three in 2013, and two in 2014, to support his opinion as to the fair market value of the leases. These transactions occurred in three different geological basins and involved between 52,000 and 1,002,000 net acres. Eight of the properties had production at the time of the sale. Additionally, the sales prices in these transactions varied between $4,756 and $39,683 per acre.

Patterson admitted (1) that the other transactions were not in the same basin as the leases at issue in this case, (2) that the other transactions involved "plays" that "span over hundreds of miles," (3) that thousands of wells had been drilled in those plays, and (4) that less than a hundred wells had been drilled on the leases at issue in this case. Other than noting that the other transactions involved "large acreage" and "similar geology," Patterson offered no evidence that the properties sold in those transactions were similar to the leases at issue in this case. Patterson also did not distinguish any property by the type of drilling activities that occurred on the property, the location of the property, or the amount of production derived from the property. In other words, Patterson failed to establish that the prices paid in the other transactions were relevant to his opinion as to the fair market value of the leases in this case.

Patterson also testified that the price per acre that Apache was willing to pay in 2014 for "resource shale opportunities" was indicative of the price per acre that Apache would have been willing to pay in 2011 for the same opportunities.

47

However, Patterson admitted that Apache purchased 75% of Appellants' interests in the 109 leases on March 22, 2011, for approximately $393 per acre. Further, in a transaction that was signed on September 1, 2011, but effective on March 23, 2011, Appellants sold their remaining interests in sixty of the leases to NextEra Energy for approximately $1,500 an acre.

Because a "lot of things about the nature of the property" changed between March 22, 2011, and November 1, 2011, Patterson did not consider either of these transactions in forming his opinion that the fair market value for the leases on November 1, 2011, was $6,000 per acre. Patterson also did not consider that, in 2011, Apache declined to exercise its right of first refusal as to the interests that Appellants sold to NextEra and that Apache refused to pay $1,500 an acre for those interests. In fact, no evidence was presented that Apache was willing to pay the same price for the leases in 2011 that it was willing to pay in 2014.

Finally, Patterson relied on his personal experience in valuing properties between 2010 and 2014 to support the application of the 75% fair market value adjustment factor. "However, in very few cases will the evidence be such that the trial court's reliability determination can properly be based only on the experience of a qualified expert" to the exclusion of other factors. *Camacho*, 298 S.W.3d at 638. As such, because Patterson's "bald assurance of validity" of the fair market value adjustment factor is not enough to establish reliability, we are required to independently evaluate the underlying data. *See Merrell Dow Pharms, Inc. v. Havner*, 953 S.W.2d 706, 712–13 (Tex. 1997).

Between 2010 and 2013, Patterson completed "a couple" of "fairness opinions in support of mergers" that "came up with values similar to this on an adjustment factor." He also completed "valuations for trusts and other private transactions" that "came up with" a fair market value adjustment factor "of around" 75%. Patterson provided no details about the properties that he valued between 2010 and 2014.

Further, although the fair market value adjustment factor that Patterson used in those valuations could have ranged between 50% to over 100%, Patterson offered no evidence to show which, if any, of those transactions involved properties that were similar to the leases at issue in this case or that were being developed in the same manner as these leases.

The similarity in properties is essential to determining the reliability of the fair market value adjustment factor because the 75% fair market value adjustment factor that Patterson used to value the leases between 2011 and 2014 was based on information in the 2014 investor presentations that related to Apache's development of the Canyon Lime formation by horizontal drilling activities and on the prices that Apache was willing to pay in 2014 for leases that could be developed as a resource play. However, it is undisputed that, between 2011 and 2014, Apache was developing the Canyon Wash formation as a conventional play through vertical drilling activities and that the Canyon Wash formation did not meet all the criteria to be classified as a resource play. Consequently, with no evidence that properties similar to the leases at issue in this case were appropriately valued based on the same assumptions, the fair market adjustment value utilized by Patterson to value other properties would have no relevance to the value of the leases at issue here.

Appellants argue that Apache is estopped from challenging Patterson's decision to use a fair market value adjustment based on the 2014 investor information that related to the development of the Canyon Lime formation because Apache had requested that the Texas Railroad Commission treat the Canyon Lime and the Canyon Wash formations as one reservoir. However, Apache's request to the Railroad Commission was for the sole purpose of establishing spacing rules for the development of the entire field. Moreover, Appellants produced no evidence that, between 2011 and 2013, Apache expressed any intent to develop the Canyon Wash formation as a resource play through horizontal drilling activities.

If the variables applied to the discounted cash flow methodology are inaccurate, then the resulting fair market value figure will also be incorrect. *See Polk Cty. v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex. 1977). On this record, we cannot conclude that the trial court abused its discretion when it determined (1) that Patterson's use in 2011, 2012, and 2013 of a 75% fair market value adjustment factor, that was based on and obtained from 2014 data, related to a different geological formation and was subject to development by a different drilling method, was inaccurate and (2) that, as a whole, the appraisal method used by Patterson was not reliable evidence of the fair market value of the leases for those years. *See Sharboneau*, 48 S.W.3d at 183. Accordingly, we hold that the trial court did not abuse its discretion when it granted Apache's motion to exclude Patterson's testimony and denied Appellants' motion to reconsider.

D. *Huddleston*

Appellants next contend that the trial court erred when it excluded the testimony of Huddleston, Appellants' second damages expert. Appellants specifically argue that the trial court abused its discretion when it determined that Huddleston was required to update his opinions after the trial court ruled on Apache's motions for partial summary judgment that addressed the expiration date of the Bivins Ranch North Block lease and how to account for the working interest originally owned by Gunn Oil.

Huddleston used the comparable transaction method to calculate Appellants' damages based on the fair market value of leases that had expired. To determine the value of these leases between 2011 and 2014, Huddleston based his opinions on the sales of the leases that are at issue in this case or of leases from acreage located in the general vicinity. However, the significant downturn in oil prices that occurred in 2015 resulted in a substantial decline in the fair market value of the leases as of November 1, 2015.

50

In Huddleston's opinion, the fair market value of the leases was $1,363 per acre on November 1, 2011; $1,500 per acre on November 1, 2012; $1,600 per acre on November 1, 2013; $6,450 per acre on November 1, 2014; and $200 per acre on November 1, 2015. Huddleston further opined that the value of Apache's share of the "Expired Acres" was $6,945,669 on November 1, 2011; $7,091,181 on November 1, 2012; $1,548,904 on November 1, 2013; $187,529,648 on November 1, 2014; and $695,735 on November 1, 2015. In light of these valuations, Huddleston calculated that Appellants' total damages were $203,845,137.

The majority of the damages calculated by Huddleston were based on the loss of the Bivins Ranch North Block lease. In Huddleston's opinion, because the North Block lease expired on December 31, 2015, Apache should have offered its interest in that lease to Appellants no later than November 1, 2014.

Apache moved to exclude Huddleston's testimony on the grounds that Huddleston made no adjustments to the selected comparable transactions; that valuations based on comparable transactions always require at least some level of adjustment; that the other transactions relied upon by Huddleston required substantial adjustments; and that the North Block lease expired on January 1, 2016, not on December 31, 2015. The trial court granted Apache's motion to exclude, in part, and excluded any testimony by Huddleston that related "to an expiration date on the North Block of the Bivins Ranch Lease other than January 1, 2016." The trial court also granted summary judgment in favor of Apache and determined (1) that "damages associated with the North Block of the Bivins Ranch Lease, if any, must be calculated as of November 1, 2015," and (2) that "damages for breach of or failure to comply with Section 4.1 of the PSAs must be based on the working interest that each [Appellant] conveyed to Apache in March 2011, and will exclude any interest once held by Gunn Oil."

51

Less than a week before the scheduled trial date, Apache filed a second motion to exclude Huddleston's testimony on the ground that Appellants had not timely updated their responses to Apache's request for disclosures to designate a new damages amount based on the trial court's summary judgment rulings. Apache specifically asserted that Huddleston's damage calculations did not comply with the law of the case and were not relevant. The trial court granted Apache's motion and excluded Huddleston's testimony in its entirety.

As we have said, the trial court erred when it granted Apache's motions for summary judgment on the expiration date of the North Block lease and on whether Section 4.1 required Apache to convey to Appellants any interest in the affected leases that was originally owned by Gunn Oil. Accordingly, the trial court erred (1) when it determined that Huddleston was required to update his damage calculations based on these erroneous rulings and (2) when it excluded Huddleston's opinions as to any damages that Appellants sustained based on the expiration of the North Block lease on December 31, 2015, or on Apache's alleged failure to offer to Appellants the working interest originally owned by Gunn Oil. *See Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870 ("A trial court abuses its discretion in excluding expert testimony if the testimony is relevant to the issues in the case and is based on a reliable foundation.").

E. *Graves*

Appellants designated Graves as an accounting expert and disclosed that Graves might also testify as to damages. However, Graves did not initially offer an opinion on damages. On March 18, 2019, two weeks before the commencement of trial, Appellants supplemented Graves's opinions based on information about cost write downs on expired and abandoned leases that were contained in an accounting spreadsheet that Apache had updated on February 27, 2019. In the supplementation,

Graves opined that the "floor value" of the Bivins Ranch North Block lease was $16,603 per acre in 2014 and $2,971 per acre in 2015.

Apache filed a motion to exclude Graves's testimony on the ground that the supplemental opinions were not timely disclosed; were not based on new information; and were based on information that related to costs that Apache had incurred on the project, rather than on Apache's valuation of the leases. At the hearing on Apache's motion to exclude, Megan Bennett, one of Graves's associates, testified that "the amounts that were written off in the leases expired and abandoned is at least Apache's minimum floor value the previous quarter." Bennett admitted that the information about cost write downs on expired and abandoned leases was contained in spreadsheets that had been produced by Apache beginning in 2017. Bennett, however, did not focus on those entries because they were labeled as "NB" or not billable.

The trial court granted Apache's motion to exclude Graves's testimony based on the cost write downs. Appellants contend that the trial court erred when it excluded Graves's opinions on damages because the accounting records produced by Apache reported lease values and because good cause was shown to allow Graves to supplement his opinions.

A party's duty to supplement written discovery regarding a testifying expert is governed by Rule 193.5 of the Texas Rules of Civil Procedure. TEX. R. CIV. P. 195.6. Pursuant to Rule 193.5, the duty to supplement or amend arises when a party learns that its previous responses to written discovery were incomplete or incorrect when made or are no longer complete or correct. TEX. R. CIV. P. 193.5(a). The responding party must amend or supplement its discovery responses (1) to the extent that the written discovery sought the identification of persons with knowledge of relevant facts, trial witnesses, or expert witnesses and (2) to the extent that the written discovery sought other information, unless the additional or corrective

information was made known to the other parties in writing, on the record at a deposition, or through other discovery responses. TEX. R. CIV. P. 193.5. Further, if an expert witness is retained by, employed by, or otherwise under the control of a party, the party must amend or supplement any deposition testimony or report made by the expert with regard to the expert's mental impressions or opinions and the basis for them. TEX. R. CIV. P. 195.6.

An expert may refine his calculations or perfect his report through the time of trial without invoking the need to supplement. *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993); *see also Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 717–18 (Tex. 2016). An expert may also modify his opinion testimony without the need to supplement if he is merely expanding on a subject that has already been disclosed. *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 53 (Tex. App.—San Antonio 2006, no pet.); *Norfolk S. Ry. Co. v. Bailey*, 92 S.W.3d 577, 581 (Tex. App.—Austin 2002, no pet.). "However, a party may not present a material alteration of an expert's opinion at trial that would constitute a surprise attack." *Bailey*, 92 S.W.3d at 581; *see also W. Tex. Gathering*, 868 S.W.2d at 305.

A party who fails to timely amend or supplement a discovery response that pertains to a testifying expert's opinions may not offer the expert's testimony unless the trial court finds (1) that there was good cause for the failure to timely provide the information or (2) that the failure to provide the discovery will not unfairly surprise or prejudice the other party. TEX. R. CIV. P. 193.6(a), *amended by* Dec. 23, 2020 Tex. S.Ct. Order No. 20-9153 (effective January 1, 2021); *see also Fort Brown Villas III Condo Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 881 (Tex. 2009). This exclusionary rule applies equally to trial and summary judgment proceedings. *Gillenwater*, 285 S.W.3d at 882; *see also F.W. Industries, Inc, v. McKeehan*, 198 S.W.3d 217, 220–21 (Tex. App.—Eastland 2005, no pet.).

Graves's March 20, 2019 supplemental opinions concerning the floor value of the Bivins Ranch North Block lease in 2014 and 2015 were not timely disclosed to Apache. Furthermore, Graves's supplemental opinions cannot be construed as either a modification or refinement of his previous opinions. Therefore, the exclusion of these new opinions was automatic absent a showing of good cause, unfair surprise, or unfair prejudice. *See Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854, 860 (Tex. App.—Dallas 2006, no pet.). As such, Appellants had the burden to establish a basis for allowing the introduction of this evidence. *See* TEX. R. CIV. P. 193.6(b); *F 1 Constr., Inc. v. Banz*, No. 05-19-00717-CV, 2021 WL 194109, at *2 (Tex. App.—Dallas Jan. 20, 2021, no pet.) (mem. op.).

Appellants argue that they established good cause for the admission of Graves's supplemental opinions at trial because Apache had previously produced the spreadsheets that contained the entries for the expired and abandoned leases shortly before trial. However, the information that Graves relied on to formulate his supplemental opinions had been produced by Apache as early as 2017. Further, other than Bennett's testimony that she did not focus on the write down entries in the spreadsheets, no other explanation was offered by Appellants to establish why Graves could not have formed these opinions sooner. Inadvertence of counsel, lack of surprise, and uniqueness of the excluded evidence do not, standing alone, constitute good cause. *Alvarado v. Farah Mfg. Co*, 830 S.W.2d 911, 914–15 (Tex. 1992). Such is the case here. Accordingly, we hold that the trial court did not abuse is discretion when it granted Apache's motion to exclude Graves's new opinions.

F. *Conclusion*

Appellant's second issue is sustained in part and overruled in part. We sustain Appellants' second issue to the extent that Appellants challenge the trial court's exclusion of Huddleston's testimony. In all other respects, we overrule Appellants' second issue.

## IV. *No-Evidence Summary Judgment on Damages*

After the trial court granted Apache's motions to exclude all of Appellants' experts on damages, Apache filed, with leave of court, a no-evidence motion for partial summary judgment in which it challenged Appellants' remaining breach-of-contract and tort claims on the ground that Appellants neither had nor could produce any evidence of damages. In their response to Apache's motion, Appellants submitted and relied on deposition testimony and affidavits from individuals associated with Appellants to show that Apache failed to offer to Appellants its interest in leases that were either lost or released and failed to provide payout statements to Appellants as to the status of the Back-In Trigger. Appellants also relied on a payout statement prepared by Apache that stated that the "Back-In Trigger" was zero in late 2013. As to the amount of its damages, Appellants submitted and relied on (1) the reports and affidavits of Patterson, Graves, and Huddleston; (2) the reports and deposition testimony of one of Apache's designated experts in this case and of Apache's expert in prior litigation with NextEra; and (3) certain documents that they had received from Apache.

Apache objected to Appellants' reliance on the reports and deposition testimony of Apache's expert in this case, on the report of Apache's expert in the litigation with NextEra, and on Apache's internal or investor presentations. The trial court sustained Apache's objections and granted the no-evidence motion for summary judgment. Appellants assert in their first issue that the trial court erred when it sustained Apache's objections to Appellants' summary judgment evidence and when it granted Apache's no-evidence motion for summary judgment.

We review a trial court's ruling by which it sustained an objection to summary judgment evidence for an abuse of discretion. *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017). If the trial court abused its discretion when it sustained an objection to summary judgment evidence, we must determine whether

the exclusion of the evidence probably resulted in the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1); *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018). Whether the erroneous exclusion of evidence probably caused the rendition of an improper judgment is "a judgment call entrusted to the sound discretion and good sense of the reviewing court from an evaluation of the whole case." *First Emps. Ins. Co. v. Skinner*, 646 S.W.2d 170, 172 (Tex. 1983).

A. *Breach of Contract, Fraud, Negligence, and Gross Negligence*

In their fourth amended petition, Appellants alleged that they had been damaged (1) by Apache's breach of contract due, in part, to the lost ability to acquire Apache's interest in leases and the lost ability to acquire the back-in interest; (2) by Apache's negligence and gross negligence due to the loss of valuable leases and mineral interests; and (3) by fraud due, in part, to Apache's failure to provide information that would have allowed Appellants to evaluate and exercise their back-in option and lease preservation rights. As summary judgment evidence of Appellants' damages based on the alleged loss of the right to acquire Apache's interest in leases that were lost or released and the alleged loss of the right to back-in to the one-third of the interest sold to Apache, Appellants relied upon, among other evidence, Huddleston's opinions of Appellants' damages in which he opined as to the fair market value of the leases on a per acre basis on November 1 in 2011, 2012, 2013, 2014, and 2015.

We have already held that the trial court erred when it granted Apache's motion to exclude Huddleston's testimony. Therefore, because Huddleston's opinions constituted more than a scintilla of evidence as to Appellants' alleged damages on their claims for breach of contract, fraud, negligence, and gross negligence, we hold that the erroneous exclusion of Huddleston's testimony probably resulted in the improper rendition of Apache's no-evidence summary judgment on Appellants' claims for damages.

B.  *Conversion*

Appellants also asserted a claim for conversion and sought damages based on Apache's alleged failure to pay Appellants the correct amount of the proceeds from the sale of oil and gas production.  As summary judgment evidence that they had been damaged by Apache's alleged conversion, Appellants relied on charts that were included in and attached to the report of one of Apache's expert witnesses in this case that summarized the oil and gas produced from the Bivins Ranch lease and oil prices during the relevant time periods.  We need not decide whether the trial court properly sustained Apache's objections to Appellants' reliance on the information in Apache's expert's report because, even if we consider the information relied upon by Appellants, it does not constitute a scintilla of evidence of damages.

Conversion is the wrongful exercise of dominion and control over another's personal property in denial of or inconsistent with his rights.  *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971).  Under certain circumstances, money is subject to conversion.  *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 456 (Tex. App.—Eastland 2006, pet. denied).  However, in this case, the summary judgment evidence relied upon by Appellants established only the amount of oil and gas produced from the Bivins Ranch lease and the value of that production based on the price of oil during the relevant time periods.  In fact, Appellants produced no summary judgment evidence to establish how much of the proceeds from this production was allegedly misappropriated by Apache.  Accordingly, because Appellants failed to produce more than a scintilla of evidence that their damages were due to wrongfully appropriated property, we hold that the trial court properly granted Apache's no-evidence motion for summary judgment on Appellants' claim for conversion.

C. *Conclusion*

We sustain the remainder of Appellants' first issue to the extent that they challenge the trial court's grant of Apache's no-evidence summary judgment on Appellants' claims for breach of contract, negligence, gross negligence, and fraud. We overrule the remainder of Appellants' first issue to the extent that they challenge the trial court's grant of Apache's no-evidence summary judgment on Appellants' claim for conversion.

V. *Attorneys' Fees and Final Judgment*

Finally, in their third and fourth issues, Appellants assert that the trial court erred when it awarded Apache attorneys' fees and when it rendered its final judgment based on the combination of its partial summary judgment rulings and orders excluding expert witnesses.

The trial court awarded attorneys' fees to Apache under the Texas Declaratory Judgments Act due to Apache's success in obtaining declarations of the meanings of certain PSA provisions. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2020) (authorizing the trial court to "award costs and reasonable and necessary attorney's fees as are equitable and just" in a declaratory judgment action). Because of the trial court's rulings that we have reversed, we conclude that, in light of our holdings, the issue of attorneys' fees must be reversed and remanded to the trial court for reconsideration. *See Eagle Oil & Gas*, 619 S.W.3d at 710; *Wells Fargo Bank Nw., N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 713 (Tex. App.—Dallas 2012, no pet.). Further, in light of our reversal of the grant of Apache's no-evidence summary judgment on the issue of damages, the trial court's final judgment must also be reversed.

Accordingly, we sustain Appellants' third and fourth issues.

## VI. *This Court's Ruling*

We affirm in part, and reverse in part. We affirm the trial court's orders excluding Patterson's testimony and Graves's March 2019 testimony on Appellants' claimed damages. We also affirm the trial court's summary judgment orders and determinations (1) on the meaning of "Leases" and "affected Leases" in Section 4.1 of the PSAs and (2) that Appellants take nothing on their claims for breach of express trust, breach of fiduciary duty, misapplication of fiduciary property, and conversion. We reverse the trial court's order excluding Huddleston's testimony. We reverse the trial court's summary judgment orders (1) that concern how to account for the working interest originally owned by Gunn Oil, (2) that concern how to calculate the Back-In Trigger, (3) that concern the expiration date of the North Block lease, and (4) that Appellants take nothing on their claims for breach of contract, fraud, negligence, and gross negligence. We also reverse the trial court's award of attorneys' fees to Apache and the trial court's final judgment. In light of our holdings, the issues that we have reversed are remanded to the trial court for further proceedings consistent with this opinion.


W. STACY TROTTER
JUSTICE


June 10, 2021

Panel consists of: Bailey, C.J.,
Trotter, J., and Wright, S.C.J.[14]

Williams, J., not participating.

---

[14]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.